Henry J.N. TAUB, H. Ben Taub, Henry J.N. Taub, II, Kitchco Realty, Ltd., Marcy Taub, and Metco Petro, Ltd., Appellants,

v.

HOUSTON PIPELINE COMPANY and HPL Resources Company, Appellees.

No. 06–01–00073–CV.

Court of Appeals of Texas, Texarkana.

Submitted Feb. 27, 2002.

Decided April 10, 2002.

Rehearing Overruled June 11, 2002.

608

Richard D. Watt, R. Kyle Hawes, Kerry C. Williams, Chamberlain, Hrdlicka, White, Michael A. Lam, A. Randall Friday, Crady, Jewett & McCulley, LLP, Houston, for appellants.

Carrin F. Patman, Matthew F. Carroll, Bracewell & Patterson, LLP, Houston, for appellees.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice ROSS.

Henry J.N. Taub, H. Ben Taub, Henry J.N. Taub, II, Kitchco Realty, Ltd., Marcy Taub, and Metco Petro, Ltd. (collectively, the Taubs) appeal from a summary judgment granted in favor of Houston Pipeline Company and HPL Resources Company (collectively, HPL). Enron Oil & Gas Company was an additional defendant, but the Taubs settled with Enron before this appeal.

### Background

This case concerns a 254–acre tract of land in northern Harris County overlaying the Bammel Field, a natural gas field discovered in the 1930s. The Taubs owned the surface rights. By the 1960s, Houston Natural Gas Production Company owned the Bammel Field. The Bammel Cockfield sand, an oil and gas reservoir approximately 6,200 feet below the surface, had been substantially depleted. Houston Natural Gas desired to turn this depleted reservoir into a natural gas storage facility, and to accomplish this, needed to unitize the oil and gas leases, and required additional rights to use the surface in ways that exceeded its rights under the oil and gas leases.

Houston Natural Gas, along with the lessors of oil and gas leases, and the Taubs entered into two agreements. The first was the Unit Agreement, which unitized the oil and gas leases, permitting Houston Natural Gas to utilize the Bammel–Cockfield sand for gas storage. The second was the Collateral Agreement, out of which this dispute arose.

Under the Collateral Agreement, finalized September 15, 1966, Houston Natural Gas relinquished all surface rights under the oil and gas leases, except the right to use designated two-acre well sites located immediately around the actual drilling locations and related surface easements, so long as these sites were used for certain specified operations.

The Taubs contend that, as a result of the Collateral Agreement, the operators had:

> determinable fee estates permitting use of the 2–acre wellsites and related easements, and each estate automatically terminated when a site was no longer

used for storage or other operations. By entering into the Collateral Agreement, and in exchange for agreeing to the Unit Agreement and creation of a gas storage facility beneath their surface, the surface owners [Taubs] immediately recovered most of their surface rights and limited the Operator's remaining interest to determinable fee estates in specific 2–acre wellsites and related easements.

The Collateral Agreement provided that, after September 1, 1972, any well site on the property not used by the operator for "drilling, reworking, storage, injection, repressuring, or production, during any period of 365 consecutive calendar days with respect to a Unit Well used for Unit Operations ... Operator's right to use said Wellsite shall automatically terminate...." The Collateral Agreement further provided that, if there was not an oil, gas, disposal, or injection well on one or more well sites on September 1, 1973, the operator's right to use such well sites "shall automatically terminate." Further, within ninety days after termination, the operator was to plug and cement any well, remove all equipment and facilities, level and clean the surface, and file an instrument acknowledging termination. Henry Taub, designated in the agreement as the "Landowners' representative," was to be sent a copy of each such filed instrument within fifteen days after the document was returned to the operator by the county clerk.

In 1971, Houston Natural Gas filed a "Partial Release of Surface Under Oil, Gas and Mineral Leases," as provided in the Collateral Agreement. This released all of Houston Natural Gas' interests in the surface except for the following: well sites, designated as 3M, 5M, and 6M; a heater site, designated as 4M; pipeline easements, designated as 7M, 8M, and 9M; and a roadway easement, designated as 1M (see Appendix A).

HPL acquired the interests of Houston Natural Gas around 1988 and continued its operations in the area. As reflected in responses to requests for admissions, sometime before February 1, 1990, the 4M and 5M sites were not used for "drilling, reworking, storage, injection, repressuring, or production" for 365 consecutive calendar days during the period between February 1, 1988 and January 31, 1990. HPL did not plug the well, remove all equipment, clean the surface, or file the documentation required by the Collateral Agreement. The 5M well was not plugged until April 8, 1994.

In 1993, HPL assigned its nonstorage rights in the Bammel Field to Enron, which wanted to drill a new well at a new site near the 5M site. Because of the Collateral Agreement and a partial release signed in 1971, Enron was required to obtain from the Taubs a new surface site for its well. In November 1993, Enron's employee, Warren Davis, approached Henry Taub about obtaining a new site. Henry Taub asserts in his deposition that, even though the rights to use 4M and 5M had actually terminated, he was personally unaware of the termination because the well had not been plugged and he had not received the notice required under the Collateral Agreement. He further testified he entered into negotiations with Enron, believing HPL and Enron still had rights regarding the 4M and 5M sites. In these negotiations, Davis proposed to Henry Taub that Enron enter into a new surface agreement with the Taubs for a two-acre well site, in exchange for Enron arranging for the release of the 5M site back to the Taubs.

At the Taubs' request, Enron had two surveys made of the 4M and 5M sites, one in January 1994 and one in April 1994.

The Taubs suggest the sites are falsely labeled on the surveys as "existing" sites.

On the "release" of the 5M well site, the Taubs entered into a new Surface Use Agreement with Enron on June 22, 1994. Enron drilled two new deep wells at this location. Henry Taub testified that, had he known the 4M and 5M sites had already been abandoned, he would not have entered into the surface agreement with Enron. Further, in July 1998, HPL removed a twelve-inch pipeline from the 7M and 8M rights-of-way and installed a twenty-inch pipeline.

An agreement and several supplements to that agreement, entered into between the Taubs, Enron, and HPL in May 1996 tolled the statute of limitations until December 4, 1998, for any litigation by the Taubs.

On December 4, 1998, the Taubs sued HPL and Enron, asserting claims arising from the Collateral Agreement. Generally, the Taubs claimed: 1) HPL lost its lease rights to three surface sites, 4M, 5M, and 6M, and became a trespasser by failing to use them for drilling, reworking, storage, injection, repressuring, or production for a 365 day consecutive period; 2) HPL breached the lease agreement as to two other surface sites, 7M and 8M, by replacing a twelve-inch pipeline with a twenty-inch pipeline; and 3) HPL fraudulently induced the Taubs to enter into a separate surface agreement with Enron. Causes of action asserted by the Taubs included a declaratory judgment that HPL's right to use the surface had terminated, breach of contract, fraud, trespass, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing.

The trial court signed an interlocutory order on November 27, 2000, granting HPL's motion for summary judgment. The order disposed of all the Taubs' claims against HPL. The order granted Enron's motion for summary judgment on all the Taubs' claims, except those related to the 6M well site. The Taubs' motion for summary judgment was denied. On December 19, 2000, the Taubs moved for reconsideration of the trial court's interlocutory order, alleging, among other things, that new deposition testimony had been obtained which proved portions of HPL's evidence to be false. The Taubs also moved for severance of the claims disposed of by the summary judgment. The motion for reconsideration was denied, but the severance motion was granted, making the interlocutory summary judgment order final.

*Issues*

The claims asserted by the Taubs in the trial court that are the subject of this appeal include: 1) breach of the Collateral Agreement by HPL with respect to the 4M and 5M sites; 2) HPL's fraud and conspiracy to commit fraud related to the 1994 Surface Use Agreement with Enron, and related to the 1994 drill site and the 2M site; 3) breach of the Collateral Agreement by HPL with respect to the 6M site; and 4) trespass by HPL with respect to the 4M and 5M sites, the 6M site, and by the installation of the twenty-inch pipeline on the 7M and 8M sites.

The overriding issue in this appeal, as contended by the Taubs, is whether the district court erred by granting summary judgment in favor of HPL and then erred by refusing to reconsider the summary judgment. They contend the resolution of this issue turns on: 1) whether, after HPL's determinable fee estates terminated, the Taubs should have regained title to and possession of the surface sites; 2) whether, after HPL's determinable fee estates terminated, HPL breached the Collateral Agreement by failing to plug wells, remove facilities and equipment, clean the

sites, file instruments acknowledging the terminations, and notify the Taubs; 3) whether HPL committed fraud, or conspired with Enron to commit fraud, by inducing the Taubs to enter into a Surface Use Agreement granting Enron the right to use two acres to drill new wells; 4) whether HPL trespassed on the surface sites by continuing to occupy them after the determinable fee estates terminated; 5) whether HPL exceeded its rights under the Collateral Agreement and trespassed by replacing a twelve-inch pipeline and installing a twenty-inch pipeline, or by transporting nonunit gas through the pipeline; and 6) whether the Taubs' breach of contract and trespass claims are barred by the statute of limitations.

■ The trial court granted HPL's motion for summary judgment and dismissed the Taubs' claims with prejudice, without specifying the reasons for its action. As an issue on appeal, the Taubs contend generally the trial court erred in granting summary judgment in favor of HPL and against them. This is sufficient to preserve this point for appeal and allows the Taubs to argue all possible grounds on which summary judgment should have been denied. *See Malooly Bros. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970); *In re Marriage of Ham,* 59 S.W.3d 326, 330–31 (Tex.App.-Texarkana 2001, no pet.).

*Summary Judgment Standard of Review*

■ Summary judgment provides a method of summarily terminating a case when it clearly appears that only a question of law is involved and that there is no genuine fact issue. *Cuyler v. Minns,* 60 S.W.3d 209, 214 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Hock v. Salaices,* 982 S.W.2d 591, 593 (Tex.App.-San Antonio 1998, no pet.). Under the traditional summary judgment standards, the party moving for summary judgment carries the bur-

den of establishing that no material issue of fact exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *Walston v. Lockhart,* 62 S.W.3d 257, 258 (Tex. App.-Waco 2001, pet. filed); *Cuyler,* 60 S.W.3d at 214. When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. On appeal, the movant still bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Nixon,* 690 S.W.2d at 548; *Walston,* 62 S.W.3d at 258; *Cuyler,* 60 S.W.3d at 214. Summary judgment is reviewed *de novo. Walston,* 62 S.W.3d at 258. Where the trial court does not specify the grounds on which it granted summary judgment on each of the causes of action, summary judgment will be affirmed if any of the theories advanced are meritorious. *Lang v. City of Nacogdoches,* 942 S.W.2d 752, 757 (Tex.App.-Tyler 1997, writ denied).

*Breach of Contract*

■ The elements of a breach of contract claim are: 1) existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff resulting from the breach. *Wright v. Christian & Smith,* 950 S.W.2d 411, 412 (Tex.App.-Houston [1st Dist.] 1997, no pet.). HPL contended in its motion for summary judgment that the statute of limitations bars the Taubs' breach of contract claims and also contended that it established as a matter of law the Taubs were not damaged by the alleged breach of contract, one of the essential elements of their cause of action.

HPL, as the movant for summary judgment, had the burden of establishing by competent summary judgment evidence that there was no genuine issue of material fact as to one or more essential elements of the plaintiff's cause of action. *See Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 474 (Tex.1995). HPL cites *Modern Exploration, Inc. v. Maddison*, 708 S.W.2d 872 (Tex.App.-Corpus Christi 1986, no pet.), involving the failure of the holder of a mineral lease to timely commence the drilling of a well under the terms of the lease. The lessor counterclaimed for damages based on the failure of the lessee to release the acreage on which the lease had terminated. The effect of this inaction was to create a cloud on the title to the property. A suit to remove the cloud from the title is an equitable remedy, providing for no award of damages. The court found damages may be recovered in such instances for "slander of title," but in order to prove such damages, the plaintiff would have to prove the loss of a specific, subsequent sale. *Id.* at 877. The court stated, "[W]e are unwilling to hold that either a contractual or common-law duty to release acreage under a terminated mineral lease, by itself, creates an action for damages *absent proof of the loss of a specific sale.*" *Id.* (emphasis added); *see also A.H. Belo Corp. v. Sanders*, 632 S.W.2d 145, 146 (Tex.1982); *Southwest Guar. Trust Co. v. Hardy Road 13.4 Joint Venture*, 981 S.W.2d 951, 954 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).

The Taubs contend these cases are limited to an action for slander of title, which is not a cause of action on which they sued. "Slander of title" is defined as a false and malicious statement made in disparagement of a person's title to property which causes him or her special damages. *Sadler v. Duvall*, 815 S.W.2d 285, 293 (Tex.App.-Texarkana 1991, writ denied), *clarification denied*, 828 S.W.2d 339 (Tex.App.-Texarkana 1992). The requisite elements are: 1) the uttering and publishing of the disparaging words; 2) that they were false; 3) that they were malicious; 4) that the plaintiff sustained special damages thereby; and 5) that the plaintiff possessed an interest in the property disparaged. The plaintiff must demonstrate the loss of a specific sale in order to recover. *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 109–10, 115–16 (Tex.App.-El Paso 1997, pet. denied). While not a slander of title case per se, this breach of contract, trespass, and fraud action seeks recovery of damages due to the failure of the holder of the mineral leases to comply with the terms of the Collateral Agreement, which is the same situation as presented in the *Modern Exploration* case. The only difference is that the lawsuit in a slander of title case is grounded on tort law principles, while this action is brought directly pursuant to the contract. The duties in both cases arise from contractual relationships between the parties. Those duties in *Modern Exploration* arose from the lease; in this case, they arise from the Collateral Agreement. We perceive no significant difference, especially where, as here, the Taubs were paid by Enron for the granting of the 1994 surface rights and continued to receive payments from the operation of the wells on their property. It is difficult to imagine how the Taubs could establish damages by means other than a specific lost sale, due to their continued belief at the time of the Enron negotiations that HPL still had viable interests in sites 4M and 5M. As stated earlier, the plaintiff in a breach of contract action must also demonstrate damages resulting from the breach. The Taubs failed in this essential element of their cause of action for breach of contract.

■ Even if the analogy to slander of title actions is not appropriate, HPL was entitled to summary judgment on this issue under general principles of law pertaining to damages. It is a general rule of law that the victim of a breach of contract should be restored to the position it would have been in had the contract been performed. Determining that position involves finding what additions to the injured party's wealth have been prevented by the breach and what subtractions from its wealth have been caused by the breach. *Interceramic, Inc. v. S. Orient R.R. Co.*, 999 S.W.2d 920, 927–28 (Tex.App.-Texarkana 1999, pet. denied); *see also Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex.App.-El Paso 2000, no pet.). The measure of damages is just compensation for *the loss actually sustained. Stamp–Ad, Inc. v. Barton Raben, Inc.*, 915 S.W.2d 932, 936 (Tex.App.-Houston [1st Dist.] 1996, no writ). The burden is on the complaining party to establish his right to recover compensatory damages by proving he suffered a pecuniary loss as a result of the breach. *Copenhaver v. Berryman*, 602 S.W.2d 540, 543 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.). The burden is on the plaintiff to allege and prove the loss resulting from the alleged breach. Such loss must be established with a reasonable degree of certainty and cannot be left to speculation. *Wade v. Southwestern Bell Tel. Co.*, 352 S.W.2d 460, 462 (Tex.Civ. App.-Austin 1961, no writ). In *Wade*, the plaintiff sued the telephone company for loss of profits allegedly caused by Southwestern Bell's omission of his office listing in the Yellow Pages. The trial court rendered judgment for Southwestern Bell, and on appeal the Austin court affirmed, stating in part:

There was no proof of loss of any particular piece of business. Appellant had not been in the practice of law but for a year or two and was new to the practice and could not establish to any degree of certainty, his loss, which the law demands, but such claim for loss as offered was wholly speculative.

*Id.*

■ Our prior opinion in *Bellatti v. Holland Mortgage & Inv. Corp.*, 838 S.W.2d 261 (Tex.App.-Texarkana 1992, no writ), supports this point, even though that case was based on negligence rather than breach of contract.[1] In *Bellatti*, the plaintiff sought out the defendant in an effort to refinance her condominium. Her original financing was at 13.93 percent, and when the defendant was contacted, it was alleged that financing was available at 9.5 percent. One of the defendant's employees told the plaintiff the defendant would be willing and able to make the loan, and she should obtain a title policy in preparation for closing. However, three months later, the defendant informed the plaintiff that the Federal Housing Administration (FHA) required applicants to show a seventy percent or higher owner occupancy rate in order to guarantee a loan, a requirement the plaintiff could not meet. She then attempted to obtain conventional financing or FHA financing through another source, but was unsuccessful. The plaintiff alleged that the negligence of the defendant's employee kept her from obtaining alternate financing when it was available, leaving her with unnecessarily high loan payments. While the jury found some issues in favor of the plaintiff, the trial court granted judgment notwithstand-

---

1. The essential elements of actionable negligence are: 1) the existence of a legal duty owed by one person to another to protect the latter against injury; 2) breach of that duty; and 3) damages 4) proximately resulting from that breach. 53 Tex. Jur.3d *Negligence* § 5 (1997).

ing the verdict at the defendant's request. We affirmed, holding that the proof of damages submitted by the plaintiff did not establish she could have obtained financing from some other source and that she failed to demonstrate she was damaged by the defendant's employee's negligence. *Id.* at 263.

The Taubs' only allegation, as stated in Henry Taub's deposition, was that, if they had been aware HPL no longer had any legal interest in sites 4M and 5M, they would not have entered into the 1994 Surface Use Agreement. They do not claim the loss of a specific sale of the property, as would be required in a slander of title case. They also do not give an opinion as to the loss in value of the slightly more than two acres in the 1994 Enron Surface Use Agreement, compared to the property's value without such surface rights. On the other hand, Henry Taub admitted receiving payments for granting the surface rights for exploration to Enron and admitted receiving continued payments from ongoing mineral activity.

In addition to the failure to establish any basis for the calculation of damages, we also fail to see how the alleged breach of contract by HPL caused the Taubs to do, or not to do, anything detrimental to their interests. The undisputed deposition testimony shows that Henry Taub had in his possession releases from HPL of the 2M, 4M, and 5M sites for five to six weeks before signing the 1994 Surface Use Agreement with Enron. He did not testify that any sale of the property was pending at that time which hinged on the legal status of the two-plus acres of land at the 4M and 5M sites; there is no other testimony regarding additions to the Taubs' wealth that were prevented by HPL's breach, or subtractions from the Taubs' wealth caused by the breach.

Whether by analogy to slander of title, or under general principles of law pertaining to breach of contract and damages, there is no summary judgment evidence from which a trier of fact could find the Taubs suffered any recoverable damages as a result of HPL's alleged breach of its agreement. The Taubs may have suffered nominal damages, but they did not allege such damages in their response to the motion for summary judgment.

■■■■ HPL also raised the affirmative defense of limitations. The limitations period on actions for breach of contract is four years. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(3) (Vernon Supp.2002); *Morriss v. Enron Oil & Gas Co.*, 948 S.W.2d 858, 869 (Tex.App.-San Antonio 1997, no writ). The cause of action in a breach of contract accrues when the contract is breached, *Carlson v. Carlson*, 983 S.W.2d 304, 307 (Tex.App.-Houston [1st Dist.] 1998, no pet.), or when the claimant has notice of facts sufficient to place him or her on notice of the breach. *Lane v. State Farm Mut. Auto. Ins. Co.*, 992 S.W.2d 545, 549 (Tex.App.-Texarkana 1999, pet. denied). The Taubs contend that, under the tolling agreement signed by the parties, dated May 8, 1996, and as later supplemented and extended, the limitations period began to run on the four-year period on May 8, 1992. Regarding the breach of contract action, the summary judgment evidence shows HPL acknowledged a period of nonuse of the well sites in question for a 365 day consecutive period between 1988 and 1990. Under the usual tolling of the limitations period, the prescriptive period ran on the breach of contract action long before the execution of the tolling agreement in 1996 and long before suit was filed in 1998. The Taubs contend, however, that as to the breach of contract action the "discovery rule" is ap-

plicable to toll the running of the limitations period.

As a general rule, a cause of action accrues when a wrongful act causes some legal injury, even if the fact of the injury is not discovered until later and even if all resulting damages have not yet occurred. *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex.1997). The "discovery rule" is an exception to the general rule that an action does not accrue until the plaintiff knew, or in the exercise of reasonable diligence should have known, of the wrongful act and resulting injury. *Id.* The discovery rule has generally been applied in two types of situations: 1) in cases where the nature of the injury incurred is inherently undiscoverable and the evidence of the injury is objectively verifiable; and 2) in cases of fraud and fraudulent concealment. *Id.; S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex.1996). To be "inherently undiscoverable," an injury need not be absolutely impossible to discover, nor does it mean a particular plaintiff did not discover his or her injury within the prescribed period of limitations. It is not dependent solely on the nature of the injury, but on the circumstances in which it occurred and the diligence of the plaintiff. "An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *S.V.*, 933 S.W.2d at 7. The Texas Supreme Court has determined the discovery rule is applicable in many instances involving legal malpractice because a lawyer's error could not be discovered by a person ignorant of the law, *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex.1988), and in certain types of medical malpractice cases. *Hays v. Hall*, 488 S.W.2d 412, 414 (Tex.1972) (plaintiff who underwent vasectomy and was told he was sterile cannot know he is still fertile until either his wife becomes pregnant or he undergoes further testing); *Gaddis v. Smith*, 417 S.W.2d 577 (Tex.1967) (physician leaves foreign object, such as a sponge, inside patient's body after surgery). In the *Murphy* case, the Texas Supreme Court determined faulty tax advice from accountants was "inherently undiscoverable" in the same manner as if the advice was dispensed by an attorney, because "it is most unlikely that a client would know that tax advice was faulty at the time he received it." *Murphy*, 964 S.W.2d at 271.

We hold the injury alleged in this case is not inherently undiscoverable. The alleged injury involves tangible things: oil and gas exploration activities occurring on the surface of land located in a metropolitan area. Whether drilling equipment is located on the surface area is readily apparent by the mere viewing. Diligence is required by the owner of the surface as to the operation of oil and gas leases, particularly where operation or lack thereof at the lease site is legally significant. "Inherently undiscoverable encompasses the requirement that the existence of the injury is not ordinarily discoverable, *even though due diligence has been used.*" *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex.1996) (emphasis added). "As owners of an interest in the mineral estate, the Neels had some obligation to exercise reasonable diligence in determining whether adjoining operators have inflicted damage." *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998). In *Neel*, the court held the owner's obligation of due diligence went beyond mere passive visual observation, but also extended to inquiries of the lessees as to their activities. *Id.* The court also determined records filed with and available at the Texas Railroad Commission could provide the requisite notice to the owners. *Id.* at 886–87.

The Taubs argue the nature of the activities conducted on the land in question would not lend itself to being discovered by mere visual observation. As *Neel* holds, the obligation goes beyond this and may include inquiries as to the nature of the operator's activities. This is something the Taubs would be expected to do. The summary judgment evidence indicates they are sophisticated and active participants in oil and gas matters.

As to whether there was fraudulent concealment such as to invoke application of the discovery rule, fraudulent concealment is an equitable doctrine that provides an affirmative defense to the plea in bar of limitations. The basic tenet of this defense is the defendant's active suppression of the truth or its failure to disclose the truth when under a duty to speak. The elements of fraudulent concealment are: 1) actual knowledge by the defendant that a wrong has occurred; and 2) a fixed purpose to conceal the facts necessary for the plaintiff to know that a wrong has occurred. *AT & T Corp. v. Rylander*, 2 S.W.3d 546, 557 (Tex.App.-Austin 1999, pet. denied). In a summary judgment situation, the plaintiff has the burden of producing proof which raises an issue of fact with respect to that claim. *Santanna Natural Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 889–90 (Tex.App.-Austin 1997, pet. denied).

The same factors that made the injuries alleged here not "inherently undiscoverable" also demonstrate the lack of fraudulent concealment. The well sites were in plain view on the property, and the Taubs produced no summary judgment evidence indicating HPL conducted its activities in such a manner as to pretend there was activity which, in fact, was not occurring. Even if the legal status of property is a proper subject for misrepresentation, there was no summary judgment evidence

to indicate HPL was aware its interests in the 4M and 5M sites were subject to abandonment under the terms of the Collateral Agreement, yet deliberately concealed this knowledge or belief from the Taubs.

We hold that, in addition to having no valid claim due to lack of cognizable damages, any claim for breach of contract is barred by the applicable statute of limitations.

### Trespass

HPL contended in its motion for summary judgment that the Taubs' trespass claims are also barred by limitations. The limitations period for a trespass action is two years. TEX. CIV. PRAC. & REM.CODE ANN. § 16.003 (Vernon Supp.2002); *First Nat'l Bank v. Levine*, 721 S.W.2d 287, 288–89 (Tex.1986). The cause of action for trespass accrues when facts come into existence which give a claimant a right to seek a remedy in the courts. *Fields v. City of Texas City*, 864 S.W.2d 66, 68 (Tex.App.-Houston [14th Dist.] 1993, writ denied). The Taubs contend that, under the provisions of the tolling agreement, the period of limitations began to run on May 8, 1994, two years before the date of the execution of the tolling agreement.

The summary judgment evidence as to the period of inactivity that would have terminated HPL's interest in the surface of the 4M and 5M sites (and thus caused a trespass) is the same period during which any alleged breach of contract would have occurred, i.e., between 1988 and 1990. In addition, the undisputed evidence indicates HPL plugged its 4M and 5M sites no later than April 19, 1994, the date HPL executed a partial release to the Taubs. Even if there was a trespass before that time, none occurred for more than two years before the execution of the tolling agreement. As with the breach of contract

claim, application of the discovery rule is the only means of saving this claim.

The same summary judgment evidence cited with reference to the breach of contract claim also establishes the alleged trespass was neither inherently undiscoverable by the Taubs nor fraudulently concealed by HPL. The discovery rule would not, therefore, be applicable, and we hold that the trespass claim is also barred by the statute of limitations.

### Fraud and Fraudulent Inducement

HPL contended it was entitled to summary judgment on the Taubs' fraud and fraudulent inducement claims because the evidence conclusively established: 1) there was no misrepresentation; 2) there was no evidence of fraudulent intent; and 3) there was no showing of reliance.

To prevail on a fraud claim, a plaintiff must prove: 1) that the defendant made a material misrepresentation; 2) that the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of the truth; 3) that the defendant intended the plaintiff to act on the representation; and 4) that the plaintiff actually and justifiably relied on the representation. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex.2001).

The deposition of Henry Taub was filed in support of HPL's motion for summary judgment. In that deposition, Henry Taub testified that Warren Davis dealt with him to acquire the surface rights in 1994 and that Davis worked for Enron, not HPL. Henry Taub admitted that no one from HPL made any representations to him that were not true during the relevant time period. While a corporation may be liable for its torts, the very nature of a corporation is that it must act through its officers or agents. *Cotton Belt R.R. v.*

*Hendricks*, 768 S.W.2d 865, 870 (Tex.App.-Texarkana 1989, no writ). The Taubs do not contend (and there is no summary judgment evidence showing) Davis was acting as the agent for HPL when he negotiated the Surface Use Agreement with Henry Taub. Therefore, there is no issue of material fact that HPL made any misrepresentation.

The most significant reason why the summary judgment should be sustained on the claim of fraud is the nature of the alleged misrepresentations themselves. Generally, claims of fraud cannot arise from legal opinions. *Fina Supply, Inc: v. Abilene Nat'l Bank*, 726 S.W.2d 537, 540 (Tex.1987); *Gold Kist, Inc. v. Carr*, 886 S.W.2d 425, 430 (Tex.App.-Eastland 1994, writ denied); *Bryant v. Transcon. Gas Pipe Line Corp.*, 821 S.W.2d 187, 190 (Tex.App.-Houston [14th Dist.] 1991, writ denied). Henry Taub testified Davis told him 4M and 5M were "unused" sites, rather than "abandoned" sites; he stated a surveyor's document showed that 5M was an "existing" site. These comments clearly refer to the legal status of the sites, not to physical facts about the sites. A determinable interest in real property, including an oil and gas interest, terminates automatically on the happening of the contingency established when the interest was created. *See generally Harvey v. Alexander*, 671 S.W.2d 727, 730 (Tex.App.-Fort Worth 1984, no writ); BLACK'S LAW DICTIONARY 460 (7th ed.1999). This change concerns only the legal status of the land; nothing physical may have changed. Clearly, the misrepresentation, if any, pertained solely to its legal, not physical, condition.

The law has recognized certain exceptions to this general rule: 1) where a party having superior knowledge takes advantage of another's ignorance of the law to deceive him by studied concealment and

misrepresentation; 2) where there is a fiduciary relationship between the parties; and 3) where misrepresentations involving a point of law are intended to be misrepresentations of fact and are understood as such. *Fina Supply, Inc.*, 726 S.W.2d at 540. Henry Taub was not ignorant of the law; he worked with attorneys on a continuing basis in his business and had been involved in many oil and gas cases. He was a sophisticated participant in the business and certainly would not have undertaken a significant transaction in this area without legal counsel. Neither the Taubs and Davis, the Taubs and Enron, nor the Taubs and HPL had a fiduciary relationship with each other. Further, we cannot say there is any genuine issue of material fact that the Taubs justifiably relied on any representations made by Davis. As stated, Henry Taub was a sophisticated participant in the oil and gas business. The Taub family and Enron are two sophisticated business entities, dealing at arm's length, both with access to legal counsel.

The trial court correctly granted HPL's motion for summary judgment on the issues related to fraud.

### Civil Conspiracy

 An actionable civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The required elements to establish a civil conspiracy are: 1) two or more persons; 2) an object to be accomplished; 3) a meeting of minds on the object or course of action; 4) one or more unlawful, overt acts; and 5) damages as a proximate result. *Lesikar v. Rappeport*, 33 S.W.3d 282, 301 (Tex.App.-Texarkana 2000, pet. denied). The Taubs contend the summary judgment evidence shows there is a genuine issue of material fact on their claim of

civil conspiracy between Enron and HPL. Specifically, they contend: 1) that Davis, Enron's employee, acted in concert with HPL to defraud the Taubs by misrepresenting that HPL and Enron had existing rights to use the 4M and 5M sites, and these rights would be exchanged for the new Surface Use Agreement; 2) that the purpose and object of the conspiracy was to procure the new Surface Use Agreement; and 3) that the alleged overt act was the act of HPL in execution of the partial release of the 4M, 5M, and 9M sites, which contained the representation that HPL had existing rights to these sites.

In support of their civil conspiracy claim, the Taubs direct us to an April 19, 1994, memorandum from Davis to HPL, informing HPL that Henry Taub had requested a release of abandoned surface sites and easements at the Bammel Field, in accordance with the 1966 Collateral Agreement. The memorandum stated HPL had plugged the 4M and 5M sites, and had removed the heater equipment and pipeline from 9M. The Taubs further contend that, by signing the partial release, HPL committed an overt act of fraud by representing in such release that it owned existing drilling rights at the sites which had been legally abandoned through inactivity.

We disagree these two documents establish an overt, unlawful act in furtherance of a civil conspiracy. The memorandum advised HPL the Taubs signed a surface agreement with Enron pending the release. It refers to the 4M and 5M sites as "abandoned," which is the status the Taubs contend these sites should have had under the terms of the Collateral Agreement. The memorandum advised HPL those sites had been plugged and the equipment had been removed. Further, the memorandum indicated Henry Taub was the one

requesting the releases, because he had been made aware of the abandonment of these sites.

The only language in the partial release referring to the types of interests being released appears in the "whereas" clauses, which refer to the release of "certain" rights. Since the release was apparently given at the Taubs' request, with full knowledge of HPL's activities in removing the well from the site, we find this vague language does not constitute an overt illegal act.

HPL contends, and we agree, that, given the nature of these two documents, the Taubs cannot demonstrate how any representation about then-current rights would have caused the Taubs to sign the 1994 Surface Use Agreement with Enron. We note the partial release states it is made without warranty, recourse, or guaranty. It does no more than convey whatever rights HPL had.

### *HPL's Right to Use the 6M Well Site*

■ The Taubs contend that, based on language in the Collateral Agreement, HPL's right to use the 6M well site terminated and that the trial court erred in granting summary judgment against them on this issue. The Taubs again rely on the language in the Collateral Agreement providing that, if a well site was not used for "drilling, reworking, storage, injection, repressuring, or production" for 365 consecutive days, HPL's right to use the site automatically terminated. The Taubs argue that the issue is whether the 6M site was used for injection, production, or storage.

HPL contends the trial court ruled correctly for the following reasons: 1) the Taubs' challenge to affidavit testimony that the well was used for injection is a new issue on appeal that was not raised in their response to HPL's motion for summary judgment; 2) the summary judgment evidence established conclusively that the well was used for production, injection, and storage; 3) equitable estoppel bars the Taubs' claim; and 4) regardless, HPL was entitled to use the 6M site under adverse possession. In support of its motion for summary judgment, HPL filed three affidavits as to the continuous use of this well site from the time of HPL's acquisition until the time the well was plugged in 1996. The continuous use described in these affidavits included the type of use required by the Collateral Agreement ("drilling, reworking, storage, injection, repressuring, or production") to prevent termination.

The Taubs' summary judgment evidence included the deposition of Lucius Geer, who testified that, based on his review of certain "G9 records" filed with the Railroad Commission during the time period 1977–1980, a 365-consecutive-day period passed when HPL failed to make one of the uses required by the Collateral Agreement to prevent termination. In response, HPL attacks Geer's qualifications as an expert and the Taubs' claim that the "G9 records" show a nonuse for the requisite time. However, HPL's attacks go to the weight rather than to the admissibility of Geer's testimony. Further, HPL has not directed us to any place in the summary judgment record where it objected to Geer's deposition on the bases now asserted. Geer's deposition testimony is sufficient to raise a genuine issue of material fact regarding the 6M site.

■ Nonetheless, HPL also raised the defense of equitable estoppel and correctly contends the Taubs' response to its motion for summary judgment does not address this argument. Where a nonmovant fails to respond to a ground for summary judgment, the sole issue on appeal is whether

the movant's summary judgment evidence was legally sufficient. *Johnson v. Levy*, 725 S.W.2d 473, 476 (Tex.App.-Houston [1st Dist.] 1987, no writ); *Cox v. Bancoklahoma Agri–Serv. Corp.*, 641 S.W.2d 400, 402 (Tex.App.-Amarillo 1982, no writ).

◼ Equitable estoppel precludes the person estopped, because of that person's act, conduct, or silence, from asserting a right which he or she otherwise would have. *Forest Springs Hosp. v. Ill. New Car & Truck Dealers Ass'n Employees Ins. Trust*, 812 F.Supp. 729, 733 (S.D.Tex. 1993). As a general rule, equitable estoppel has been invoked by mineral producers as an affirmative defense in situations, such as here, where there has been a claimed violation of the mineral lease— usually some failure to engage in a required production activity—which would result in cancellation of the lease, and yet the lessors continue to receive payments or other benefits under the lease. Texas courts recognized this principle as early as 1923:

> It is true that time is of the essence of oil and gas leases; that they are to be construed most strongly against the lessee,.... Notwithstanding these rules, however, the lessor, by practical construction, by permitting the expenditure of large sums of money in development and by the acceptance of royalties, however small, by his subsequent conduct ... may waive his right to declare a forfeiture.

*Masterson v. Amarillo Oil Co.*, 253 S.W. 908, 914–15 (Tex.Civ.App.-Amarillo 1923, writ dism'd).

◼ In *Clark v. Perez*, 679 S.W.2d 710 (Tex.App.-San Antonio 1984, no writ), cited by the Taubs, the court states one cannot repudiate an instrument while simultaneously retaining the payments received under the instrument. *Id.* at 715. In *Young v. Amoco Prod. Co.*, 610 F.Supp.

1479 (E.D.Tex.1985), *aff'd*, 786 F.2d 1161 (5th Cir.1986), the plaintiffs continued to receive payments from one of the units despite claims the lease in question had terminated. The court pointed out it is essential to the doctrine of equitable estoppel that the person to be estopped had full knowledge of the real facts at the time of the occurrence of the representation, concealment, or other conduct alleged to be the basis of estoppel. *Id.* at 1487. The court further opined that, as such, the doctrine of equitable estoppel contemplates it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced, or of which he has accepted the benefits with knowledge or notice of the facts or rights involved. When the basis of the estoppel is the acceptance of benefits by the party to be estopped, the need for application of the doctrine is supported by the rule that a person who accepts and retains the benefits of a particular transaction will not thereafter be permitted to avoid its obligations or repudiate the disadvantageous position. *Id.* The court further noted the assertion of a waiver must be supported by proof of an intentional relinquishment of a known right or of intentional conduct on the part of that person sufficient to warrant an inference of the relinquishment of the right. Waiver by implication will be applied only to prevent fraud or inequitable consequences and, thus, an implied waiver must be evidenced by clear, unequivocal, and decisive acts from which can be inferred the intention to relinquish the right. *Id.* at 1488–89.

HPL contends the "G9 reports" on file with the Railroad Commission, which allegedly demonstrate inactivity such as would forfeit its rights in the surface at the 6M well site, constituted notice to the Taubs, the surface owners. HPL points

out the Taubs continued to accept payments until the 6M well site was plugged and released with full, albeit constructive, knowledge of the inactivity at well site 6M.

In *Shivers v. Texaco Exploration & Prod., Inc.*, 965 S.W.2d 727, 735 (Tex.App.-Texarkana 1998, pet. denied), we held that certain records of the Texas Railroad Commission constituted "constructive notice" because they were matters of public record. Further, the Texas Supreme Court, speaking to the issue of whether records filed with the Railroad Commission constitute "constructive notice," stated, "When the legal device of constructive notice is employed, a person is deemed to have actual knowledge of certain matters. Constructive notice creates an irrebuttable presumption of actual notice." *Neel*, 982 S.W.2d at 887. Citing *Shivers*, the Texas Supreme Court was only willing to conclude that some records of the Railroad Commission, in certain circumstances, *may* provide constructive notice. *Id.* at 887 n. 1. However, the Texas Supreme Court continued, "filings and other materials publicly available from the Railroad Commission are a ready source of information, and a cause of action for failure to provide that same information is not inherently undiscoverable." *Id.* at 887.

While the "G9 records" of the Railroad Commission, standing alone, did not constitute constructive notice to the Taubs, as constructive notice is viewed by the Texas Supreme Court, we find these filings, combined with the lack of due diligence required of the owners of land subject to mineral interests, as discussed above, did provide the requisite notice, requiring the Taubs to take some action to protect their rights. Even with this notice, the Taubs continued to accept the benefits from the mineral interests on their property. We hold HPL established the affirmative defense of equitable estoppel.

■ The Taubs also contend the trial court erred in holding HPL established by its summary judgment evidence that it has title to its leasehold interest under a theory of adverse possession. In *Hill*, 964 S.W.2d at 134, the court held mineral interests and oil and gas leaseholds are treated as real property interests, and are subject to the rules related to real property. Therefore, we hold the adverse possession rules are applicable to such interests.

In its motion for summary judgment, HPL specified only the twenty-five-year limitations period found in TEX. CIV. PRAC. & REM.CODE ANN. § 16.028 (Vernon 1986). HPL contends the Taubs' arguments concerning this defense are new on appeal and should be disregarded. We agree. Therefore, as previously noted, the only proper inquiry is the legal sufficiency of HPL's summary judgment evidence to establish adverse possession.

■ A party claiming title by adverse possession must, at a minimum, prove: 1) actual possession of the disputed property; 2) under a claim of right; and 3) which is adverse or hostile to the claim of another. *Sarandos v. Blanton*, 25 S.W.3d 811, 815 (Tex.App.-Waco 2000, pet. denied); *see also Haby v. Howard*, 757 S.W.2d 34, 37 (Tex.App.-San Antonio 1988, writ denied). We hold HPL's summary judgment evidence is legally insufficient because, while it demonstrated the required possession for the twenty-five-year period, it fails to show the possession was hostile for that requisite period.

Assuming the "G9 reports" establish the 365 consecutive days of nonuse such as would constitute a forfeiture of HPL's rights, such period of nonuse would have ended, at the outside, in 1980. Before that time, the possession was not hostile; it was under the Unit Agreement, as supplement-

ed by the 1971 partial release designating certain well sites where production was to continue, and under the terms of the Collateral Agreement. Only after the passage of the 365–day period in 1980 did the possession become hostile.

■ In order to establish adverse possession, the claimant must demonstrate, among other things, that his or her possession of the land was hostile to the owner and that it was consistently and continuously so for the duration of the statutory period. The test of hostility is whether acts performed by the claimant on the land, and the use made of the land, was of such a nature and character as to reasonably notify the true owner of the land a hostile claim was being asserted to the property. *Templeton v. Dreiss*, 961 S.W.2d 645, 670 (Tex.App.-San Antonio 1998, pet. denied).

Since the summary judgment evidence fails to establish hostile possession for the requisite time period, we hold this affirmative defense has not been established by HPL.

### *Trespass by Replacing Twelve-Inch Pipeline*

■ The Taubs contend the trial court erred in granting HPL's motion for summary judgment on the issue of whether HPL had the right to remove an existing twelve-inch pipeline in 1996 and replace it with a twenty-inch pipeline. In its motion for summary judgment, HPL contended that the original lease agreement, entered into in the 1930s permitting the laying of a pipeline, and the 1966 Unit Agreement, executed concurrently with the Collateral Agreement, authorized the producer to use as much of the surface or subsurface area as reasonably necessary for unit operations. In addition, HPL submitted an expert's affidavit regarding the necessity of the installation of the larger pipeline,

which was to accommodate increased flows.

In response to the motion, the Taubs contended only that the pipeline width is controlled by the Collateral Agreement. They did not challenge the expert witness testimony. However, on appeal, the Taubs cite to a specific section of the Collateral Agreement to which they did not refer in their response to the motion filed with the trial court. They also make other contentions as to why the trial court erred in granting summary judgment on this issue.

Issues not expressly presented to the trial court by written motion, answer, or other response cannot be considered on appeal as grounds for reversal. Tex.R. Civ. P. 166a(c); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 674–75 (Tex.1979); *Gulf Ins. Co. v. Clarke*, 902 S.W.2d 156, 158 (Tex.App.-Houston [1st Dist.] 1995, writ denied). Additional grounds urged on appeal in opposition to HPL's motion are not appropriately considered by the court. On this ground alone, we may not consider arguments raised for the first time on appeal by the Taubs.

Notwithstanding, we have reviewed the case of *Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 662 (Tex.1964), cited by the Taubs, and find it distinguishable from the situation presented in this case. In *Dwyer*, the plaintiffs, owners of the servient tenement, sought declaratory and injunctive relief against the pipeline company's removal of an eighteen-inch low-pressure pipeline from its easement, originally installed in 1926, and replacement of that line in 1959 with a thirty-inch high-pressure pipeline. The court noted the subject easement agreement contained no specifications for the size of the pipeline and did not prescribe a metes and bounds description for the easement. The court

granted the relief, stating, "[w]e hold that when defendant constructed its 18 inch pipeline with the consent and acquiescence of the plaintiff, the extent of defendant's [pipeline company's] easement rights under the 1926 agreement became fixed and certain." *Id.* at 666.

As pointed out by HPL, the situation presented here is significantly different. The original lease agreement signed in the 1930s authorized a pipeline. The Unit Agreement, entered into shortly before the Collateral Agreement in 1966, authorized the operator to use so much of the surface and subsurface as necessary to carry out its operations. Further, HPL cites to a portion of the Collateral Agreement which limited the size of the easement to a maximum of fifteen feet in width. Unlike *Dwyer*, the summary judgment evidence does not show that, by installing a twelve-inch pipeline, HPL's easement rights became fixed and certain, preventing the installation of the larger line. This issue is overruled.

Having determined that HPL was entitled to judgment on one or more of the grounds alleged in its motion, we affirm the summary judgment.

APPENDIX A