Affirmed and Memorandum Opinion filed February 7, 2006









Affirmed and Memorandum Opinion filed February 7,
2006.

 




 
 
 
 
 
 
 




 

 

 

 

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00793-CV

____________

 

GERRY MCCRANIE AND
DEWAYNE HUTCHESON, Appellants

 

V.

 

CHAMBERLAIN,
HRDLICKA, WHITE, WILLIAMS & MARTIN, P.C. AND BARRY ADKINS, Appellees

 



 

On Appeal from the 215th
District Court

Harris County, Texas

Trial Court Cause No. 02-59131

 



 

M E M O R A N D U M   O P I N I O N

This is an appeal from a summary judgment
based on limitations.  Appellants Dewayne
Hutcheson and Gerry McCranie complain that the trial court erred in granting
summary judgment in favor of appellees Barry Adkins and his law firm, Chamberlain,
Hrdlicka, White, Williams & Martin, P.C. (AChamberlain,
Hrdlicka@).  We affirm.








Factual and Procedural Background 

In November 1997,
Dewayne Hutcheson and Gerry McCranie retained Barry Adkins of Chamberlain,
Hrdlicka to represent them in the merger of their respective medical businesses
into a larger acquiring entity, Auxi Health, Inc.  Auxi sought to form a health provider and
services conglomerate by acquiring businesses from appellants and others  (hereinafter collectively Athe Founders@).  During negotiations, two issues surfaced that
eventually led to this suit:  (1) the
definition of Aexcess working capital@ (AEWC@) and (2) the
conditions under which appellants= stock Aput@ options could be
exercised.  

The original definition of EWC was
contained in section 6.08 of the Uniform Provisions to the closing documents
and used a method called Aquick ratio@ to calculate
EWC.  Because some of the Founders had
difficulty understanding the quick ratio method, Adkins notified them that Auxi
had agreed to execute individual Aside letters@ with each Founder
that would specify how EWC would be calculated. 
Adkins drafted side letters for appellants, but Auxi rejected Hutcheson=s side letter and
never executed McCranie=s. 
Subsequently, Adkins sent Auxi a redraft of Hutcheson=s original side
letter that preserved the original=s terms and added
a new EWC term providing for accounts receivable less accounts payable.[1]  Auxi did not further negotiate the terms of
the side letters, but instead directly sent appellants each a AMemorandum of
Amendment@ (the AMemo@) that defined EWC
without including accounts receivable less payable.  Neither McCranie nor Hutcheson discussed the
Memo with Adkins before signing it a few days before closing.  However, both claim that during negotiations,
they told Adkins the
side letters must provide for accounts receivable less payable or they wanted
out of the merger.








Appellants also received Auxi stock as
partial consideration for the merger. 
Auxi planned to hold an initial public offering (AIPO@) of its stock
within two years of the merger.  As
protection against the IPO=s nonoccurrence,
appellants were given put options on their stock for twelve dollars per share,
which were exercisable two years after closing if no IPO occurred.  A condition on the puts made them unable to
be exercised if repurchasing them would cause Auxi to default under its
financing agreement.  Adkins told
appellants this rendered the puts worthless. 
However, American Capital, one of Auxi=s financiers,
required the puts to be conditional before they would finance the merger.  On March 2, 1999, Adkins faxed appellants a
document entitled AWaiver of Rights,@ which conditioned
the exercise of the puts on Auxi=s complete
repayment of all obligations owed American Capital under their financing
agreement.  On the fax cover sheet,
Adkins explained that by signing the Waiver of Rights, appellants agreed they A[would] not
exercise their put rights until the >Obligations= are repaid in
full to ACS.  Obligations means principal
and interest on the Notes as well as all other monetary obligations.@  Appellants signed the waiver.

During the first days of March 1999,
appellants signed closing papers.  Adkins
told appellants that Auxi would fax them closing documents and advised them to
sign and return the documents to Auxi. 
Appellants complied and admittedly signed the documents without reading
them.  The merger officially closed on
March 9, 1999.








After closing, appellants served as directors on Auxi=s board until they
were asked to resign in September 2000. 
During August 1999, while they were still directors, appellants
corresponded with Auxi=s Steve Curtiss regarding the amount owed
them from closing.[2]  At that time, no mention was made of accounts
receivable less payable.  In early
November 2000, over a year later and two months after their resignation,
appellants renewed their collection efforts. 
At that time, appellants requested their side letters from Adkins, who
notified them on November 20, 2000 that the Memo had replaced the side
letters.  Thereafter, on March 20, 2001,
appellants tried to exercise their puts, but Auxi refused to repurchase
them.  Auxi subsequently sued appellants,
who countersued against Auxi, and the parties settled in August 2002.  On November 18, 2002, appellants filed this
malpractice suit against appellees.  The
trial court granted appellees= motion for
summary judgment based on limitations, and this appeal followed.

Summary Judgment

The standard of review for a traditional
motion for summary judgment is whether
the successful movant at the trial level carried its burden of showing that
there is no genuine issue of material fact and that judgment should be granted
as a matter of law. Tex. R. Civ. P.
166(c); KPMG Peat Marwick v. Harrison County Hous. Fin. Corp., 988
S.W.2d 746, 748 (Tex. 1999); Oliphant v. Richards, 167 S.W.3d 513, 515
(Tex. App.CHouston [14th Dist.] June 7, 2005, pet.
denied).  To be entitled to summary
judgment, a defendant must conclusively negate at least one essential element
of each of the plaintiff=s causes of action or conclusively establish
each element of an affirmative defense.  Sci. Spectrum, Inc. v. Martinez, 941
S.W.2d 910, 911 (Tex. 1997).  Under this
traditional standard, we must take as true all evidence favorable to the
nonmovant and must make all reasonable inferences in the nonmovant=s favor.  See id.

Appellees moved for summary judgment on
the statute of limitations, claiming the statute of limitations began to run
well before November 18, 2000, two years before appellants filed their malpractice
suit.  In eight issues, appellants
advance several arguments in support of their claim that the trial court erred
in granting appellees= motion for summary judgment.  First, they contend the Adiscovery rule@ brings their suit
within the statute of limitations. 
Alternatively, they raise the limitations defense of fraudulent
concealment and also claim limitations was tolled during appellees= continued
representation of them and during the pendency of appellants= underlying claim
against Auxi.  Finally, appellants argue
that they are not charged with knowledge of the Memo=s contents.  We address each of these arguments in turn.








The Discovery Rule

In their first
four issues, appellants argue the discovery rule brings their claims within the
statute of limitations.  The discovery
rule applies to legal malpractice cases. 
See Willis v. Maverick, 760 S.W.2d 642, 645B46 (Tex.
1988).  In such cases, the limitations
period begins when the claimant Adiscovers or
should have discovered through the exercise of reasonable care and diligence
the facts establishing the elements of his cause of action.@  Id. at 646.  A defendant moving for summary judgment on
the affirmative defense of limitations has the burden of conclusively
establishing that defense.  Rh_ne-Poulenc, Inc.
v. Steel, 997 S.W.2d 217, 223 (Tex. 1999); Lewis v. Nolan, 105 S.W.3d
185, 187 (Tex. App.CHouston [14th Dist.] 2003, pet.
denied).  Where the plaintiff pleads the
discovery rule as an exception to limitations, the defendant must negate the
exception as well.  Lewis, 105
S.W.3d at 187. 

Appellants claim they were unaware of
their injury, which was Adkins=s failure to
obtain their definition of EWC in the side letters, until November 20, 2000,
when Adkins informed Hutcheson that the Memo replaced the side letters.  Appellants contend that before that date,
they believed the side letters were included in the closing documents and
entitled them to accounts receivable less payable.  However, assuming appellants= claim is true, a
review of the record reveals that prior to November 20, 2000, appellants first should
have discovered through the exercise of reasonable care and diligence that
the side letters were not part of their closing documents.  Considering the size of the transaction, appellants= sophistication in
business matters, and the fact that the side letters contained terms appellants
deemed nonnegotiable, appellants should have ensured their terms were in the
closing documents.  For these reasons, we
disagree with appellants= contention that they could not have known
the side letters were not part of their closing documents until Adkins
specifically told them the Memo replaced the side letters.  See Taub v. Houston Pipeline Co., 75
S.W.3d 606, 619B20 (Tex. App.BTexarkana 2002,
pet. denied) (considering sophistication of parties when determining
application of discovery rule).  Thus, we
find appellees conclusively established that, through the exercise of
reasonable care and diligence, appellants should have discovered their injury
before November 18, 2000.  








Moreover, even if appellants= injury was not
discoverable at closing, their August 1999 correspondence with Curtiss should
have led to its discovery.  The record
shows three writings between Hutcheson and Curtiss.  These writings address the amount owed
Hutcheson from closing and specifically refer to closing documents.  Curtiss itemized the amount owed Hutcheson
without including accounts receivable less payable, a significant term during
negotiations.  Even if Hutcheson
believed, as he alleges, that cash at closing differed from accounts receivable
less payable, the fact that no mention of accounts receivable less payable was
made during these discussions should have led him to discover, in the exercise
of reasonable care and diligence, that no closing documents or side letters
provided for accounts receivable less payable. 
Curtiss also wrote McCranie in August, discussing EWC in terms of the Aquick ratio
calculation,@ which McCranie told him was wrong.  The record does not indicate that McCranie
took any further action about Curtiss=s erroneous
calculation or notified Adkins about it until over a year later.  These correspondences between appellants and
Curtiss should have alerted appellants to the possibility that the merger terms
differed from what they expected.  

Subsequently, on November 7 and 10, 2000,
respectively, Hutcheson and McCranie renewed their demands for payment and, for
the first time, included accounts receivable less payable in their calculations.  At that point, an Auxi representative told
appellants, AI=m being controlled
by what the documents were that were executed by the parties.@  A person in appellants= position,
exercising reasonable care and diligence, should have discovered their injury
based on this statement. 








We also disagree with appellants= claim that the
discovery rule caused their put option complaint to accrue on March 20, 2001,
when Auxi refused to repurchase their shares. 
Adkins originally advised appellants that their puts were worthless
because their exercise was conditioned on whether it would cause Auxi to
default in its agreement with its financiers. 
Consequently, Adkins tried to negotiate more favorable terms for
appellants, but Auxi=s financiers demanded such a condition on
the puts.  Thereafter, Adkins advised
appellants to sign the Waiver of Rights conditioning their puts on Auxi=s complete
repayment of all obligations to its financiers, a substantially similar
condition to that which Adkins had previously described as worthless.  Here, appellants claim Adkins committed
malpractice by failing to repeat his advice that the puts were worthless.  However, appellants argue they had no legal
injury until after Auxi failed to hold an IPO within two years of the merger
because had an IPO occurred, appellants= puts would never
have become exercisable and thus Adkins=s failure to
properly advise them would have been inconsequential.  We find Adkins=s failure to
advise appellants, not Auxi=s subsequent
refusal to repurchase their puts, constitutes their legal injury.  Thus, the discovery rule dates from
appellants= signing the Waiver of Rights, both
because that is when Adkins failed to repeat his advise that the puts were
worthless and because appellants should have known, based on their receipt of the
Waiver of Rights and Adkins=s accompanying
explanation,[3]
that their puts were potentially unable to be exercised.  See Willis, 760 S.W.2d at 646; Taub,
75 S.W.3d at 619B20. 
We find, based on this evidence, that appellees conclusively established
appellants should have known of their injury when they signed the Waiver of
Rights on March 2, 1999. 

We overrule appellants= first four
issues.

Fraudulent Concealment








In their fifth issue, appellants claim the
trial court erred in granting appellees= motion for
summary judgment because they raised a fact issue on their fraudulent
concealment defense.  Fraudulent
concealment is an affirmative defense to the statute of limitations, and the
plaintiff bears the burden of coming forward with proof in support of the
allegation.  Weaver v. Witt, 561
S.W.2d 792, 793 (Tex. 1977); Ponder v. Brice & Mankoff, 889
S.W.2d 637, 645 (Tex. App.CHouston [14th
Dist.] 1994, writ denied).  To prove
fraudulent concealment, a plaintiff must demonstrate the defendant had actual
knowledge that a wrong occurred, a duty to disclose the wrong, and a fixed
purpose to conceal the wrong.  McMahan
v. Greenwood, 108 S.W.3d 467, 493 (Tex. App.CHouston [14th
Dist.] 2003, pet. denied).  Thus, to toll
limitations through a fraudulent concealment defense, appellants must first
prove Adkins actually knew a wrong occurred. 
See id.  

Appellants base their argument on the fact
that Adkins received a copy of the Memo but did not discuss it with them.  Appellants contend Adkins failed to disclose
the Memo because appellants were Acash cows@ in the merger and
Adkins knew they wished to  withdraw if
they did not obtain the side letters. 
Appellants claim Adkins had a duty to disclose the Memo, citing Willis
v. Maverick and arguing that Abreach of the duty
to disclose is tantamount to concealment.@  760 S.W.2d at 645.  Appellants= argument fails
for two reasons.  First, Willis was
primarily concerned with the attorneys= failure to
disclose facts that were difficult for a layperson not possessing legal acumen
to discern.  See id.  That is not the case here, where the
definition of EWC was clear on the face of the Memo that appellants
independently received and executed without consulting Adkins.  Thus, appellants cannot rely on Adkins=s failure to
disclose.  See First City Mortg. Co.
v. Gillis, 694 S.W.2d 144, 147 (Tex. App.BHouston [14th
Dist.] 1985, writ ref=d n.r.e.) (finding a broker, as fiduciary,
had no duty to disclose terms that were disclosed in the document principal was
obligated to read).  Second,
appellants= argument that Adkins concealed the Memo to keep them in the
merger is based on conjecture unsupported by the record.  We find appellants have not raised a fact
issue regarding the elements of fraudulent concealment.  Moreover, the estoppel effect of fraudulent
concealment ends when a party learns of facts, conditions, or circumstances
that would cause a reasonably prudent person to make inquiry which, if pursued,
would lead to discovery of the concealed cause of action.  Ponder, 889 S.W.2d at 645.  As discussed above, the August 1999
correspondence with Curtiss should have led to an inquiry that would have
caused appellants to discover their side letters were not in the closing
documents.  We overrule appellants= fifth issue.

Tolling of
Limitations








In their
sixth issue, appellants argue that the statute of limitations was tolled until
April 2001 because appellees continued to represent them in their put option
claims against Auxi.  Appellants argue
that Adkins=s failure to disclose the Memo=s replacement of the side letters
tolled the limitations period, citing McClung v. Johnson, 620 S.W.2d 644
(Tex. App.BDallas 1981, writ ref=d n.r.e.).  McClung held that if a duty to
disclose exists, failure to disclose tolls the statute of limitations.  Id. at 647.  However, that holding was subsequently
modified by the Supreme Court in Willis v. Maverick, which held that the
discovery rule applies to the failure to disclose.  760 S.W.2d at 645 n.2.  As previously discussed, appellants should
have discovered that the Memo replaced the side letters either at closing or at
least by the August 1999 correspondence with Curtiss.  Thus, we find no merit in appellants= claim that limitations were tolled
until all aspects of appellees= representation of them concluded.  We overrule appellants= sixth issue.

In their
eighth issue, appellants argue the limitations period was tolled during the
pendency of their underlying claim against Auxi.  Appellants cite the Hughes rule, which
tolls limitations Awhen an attorney commits malpractice while providing legal
services in the prosecution or defense of a claim which results in litigation@ because of the risk of forcing a
client to take inherently inconsistent legal positions while litigating both
cases.  Hughes v. Mahaney &
Higgins, 821 S.W.2d 154, 156 (Tex. 1991). 
However, the alleged malpractice in this case did not occur during
appellees= prosecution or defense of a
claim.  Therefore, the Hughes rule
does not apply.  See id.; Vacek
Group, Inc. v. Clark, 95 S.W.3d 439, 447 (Tex. App.CHouston [1st Dist.] 2002, no pet.)
(holding Hughes rule inapplicable in transactional legal malpractice
case).  Moreover, at oral argument,
appellants conceded that Hughes does not apply here until the Supreme
Court modifies the rule to include transactional malpractice.  We overrule appellants= eighth issue.

Knowledge of
the Memo=s Content








Finally, in their seventh issue, appellants claim they
are not charged with knowledge of the contents of the Memo they signed on March
4, 1999.  Appellants argue that under Thigpen
v. Locke, 363 S.W.2d 247 (1962), they are excused from reading the
documents because they had a fiduciary relationship with appellees.  However, this is a misapplication of Thigpen,
which states that A[i]f there is a confidential relationship, respondents would
be relieved of the duty of reading the instruments and could justifiably rely
on their fiduciary . . . to treat them with the utmost fairness.@ 
Id. at 252.  This applies
when a fiduciary is a party to a contract, not whenever an ancillary
fiduciary relationship exists with retained counsel.  Furthermore, Texas law charges parties with
knowledge of what they sign, absent fraud. 
See In re Media Arts Group, Inc., 116 S.W.3d 900, 908 (Tex. App.BHouston [14th Dist.] 2003, no
pet.).  We are unpersuaded by appellants= argument that retaining counsel
obviates the duty to read what they signed. 
Such a policy would encourage contracting parties to hire attorneys to
avoid contractual liability and would undermine the Ashould have discovered@ component of the discovery rule
because parties would not be charged with knowledge of contracts upon which
they relied on attorneys to review. 
Thus, we overrule appellants= seventh issue.

We affirm
the trial court=s summary judgment.

 

 

 

 

/s/        Leslie
Brock Yates

Justice

 

 

 

 

Judgment rendered and Memorandum
Opinion filed February 7, 2006.

Panel consists of Chief Justice
Hedges and Justices Yates and Anderson.

 











[1]  To facilitate
reading, we refer to accounts receivable less accounts payable simply as
accounts receivable less payable.





[2]  Appellants
claim they did not originally demand payment due from closing because they knew
that Auxi was experiencing cash flow problems.





[3]  When Adkins
sent appellants the Waiver of Rights, he clearly explained their puts could not
be exercised until Auxi=s monetary obligations were paid in full.