United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 7, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

————————

No. 02-10929

————————

SPORT SUPPLY GROUP, INC.,

Plaintiff-Appellant,

versus

COLUMBIA CASUALTY COMPANY; RSKCO CLAIMS
SERVICE, INC.,

Defendants-Appellees.

Appeal from the United States District Court
For the Northern District of Texas

Before DUHÉ, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Sport Supply, Inc. ("Sport Supply") appeals the district court's grant of summary judgment

in favor of Columbia Casualty Company ("Columbia") and RSKCo Claims Service, Inc. ("RSKCo").

Sport Supply filed suit against Columbia, alleging that the insurer was required to reimburse Sport

Supply for part of the cost of defending a counterclaim brought by MacMark Corporation

("MacMark"). Sport Supply contended that MacMark's allegations of trademark infringement fell

under the provisions of the insurance policy relating to "advertising injury." Sport Supply also filed

suit against RSKCo, the loss adjusting company that it had retained pursuant to the insurance agreement, asserting various state law claims. Sport Supply alleged that RSKCo was largely responsible for Columbia's failure to provide coverage in this case. Because we conclude that Sport Supply was not entitled to coverage under the insurance policy, we affirm the district court's judgment in favor of Columbia and RSKCo.

I

The origins of the instant case can be found in the dispute between Sport Supply and MacMark. MacMark entered a licensing agreement with Sport Supply, which permitted Sport Supply to use MacMark's "Macgregor" trademark on certain sporting goods. MacMark later accused Sport Supply of breaching that licensing agreement by attempting to sell products bearing the Macgregor trademark on the Internet. MacMark eventually sent a letter to Sport Supply, stating that it planned to terminate the licensing agreement. In response, Sport Supply brought an action in Texas state court, seeking a declaration that it was not in breach of the agreement. MacMark filed a counterclaim, which alleged in relevant part that Sport Supply had breached the licensing agreement by advertising, offering to sell, and selling products with the Macgregor trademark on the Internet.[1]

Sport Supply and MacMark eventually settled their dispute. Sport Supply was not required to pay any compensation to MacMark, but, according to Sport Supply, it spent a considerable amount of money defending MacMark's counterclaim. Sport Supply therefore requested that Columbia, its

---

[1] According to MacMark, Sport Supply's Internet sales violated the agreement "in numerous ways." First of all, the licensing agreement did not give Sport Supply the authority to use the Macgregor trademark on the Internet. Second, the agreement permitted Sport Supply to advertise and sell Macgregor products only in the United States, Canada, and Mexico (and Internet sales are necessarily worldwide). Third, the licensing agreement permitted Sport Supply to sell products with the Macgregor label only to institutional customers and, by advertising and selling Macgregor products on the Internet, Sport Supply was offering those products to non-institutional customers.

insurer, pay part of Sport Supply's defense costs. Columbia responded that Sport Supply was not entitled to coverage.

Sport Supply subsequently brought the instant action against Columbia in Texas state court, seeking to recoup those defense costs. Sport Supply also filed suit against RSKCo, raising numerous state law claims. The case was removed to the federal district court for the Northern District of Texas, which had diversity jurisdiction over the dispute. The district court granted the defendants' motions for summary judgment. Sport Supply now appeals.

II

We review the district court's ruling on a motion for summary judgment *de novo*, applying the same legal standard as the district court. *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 408 (5th Cir. 2002). Summary judgment should be granted only when there is "no genuine issue as to any material fact[.]" FED. R. CIV. P. 56(c); *Wyatt*, 297 F.3d at 408-09. An issue of fact is material only "if its resolution could affect the outcome of the action." *Wyatt*, 297 F.3d at 409.

In determining whether there is a dispute as to any material fact, we consider all of the evidence in the record, but we do not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Instead, we "draw all reasonable inferences in favor of the nonmoving party[.]" *Id.*; *Wyatt*, 297 F.3d at 409. If we determine, after giving credence to the facts as presented by the nonmoving party, that "the moving party is entitled to a judgment as a matter of law," we affirm the grant of summary judgment. FED. R. CIV. P. 56(c).

Sport Supply has requested that Columbia reimburse it for part of the cost of defending MacMark's counterclaim. Thus, this case involves the "duty to defend." *See Pa. Pulp & Paper Co. v. Nationwide Mut. Ins. Co.*, 100 S.W.3d 566, 568, 570 (Tex. App.—Houston [14th Dist.] 2003, pet.

filed) (applying the "duty to defend" standard when the insured sued "to recover the cost of defending against a counterclaim"). In Texas, an insurance company's duty to defend depends on the factual allegations in the complaint and the policy language. *See Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997).[2] Thus, in determining whether Columbia must reimburse Sport Supply for its defense costs, we consider the factual allegations in MacMark's counterclaim and the terms of the policy issued by Columbia.

This case turns on whether the insurance policy that Columbia issued to Sport Supply covers MacMark's counterclaim.[3] The parties appear to agree that MacMark alleged facts to support a claim of trademark infringement. Sport Supply insists that MacMark's trademark infringement claim is covered by the "advertising injury" provisions of the policy. The policy covers "'[a]dvertising injury' caused by an offense committed in the course of advertising [Sport Supply's] goods, products, or services[.]" In the policy, "[a]dvertising injury" is defined as an injury "arising out of" one or more

---

[2] Because a court can examine only the four corners of the complaint and the four corners of the insurance policy, this approach is often described as "the eight corners rule." *Tex. Med. Liab. Trust v. Zurich Ins. Co.*, 945 S.W.2d 839, 842 (Tex. App.—Austin 1997, writ denied); *see Nat'l Union*, 939 S.W.2d at 141.

[3] Sport Supply contends that we need not reach the merits of this case. According to Sport Supply, we can reverse the district court's judgment in favor of Columbia based on the insurance company's failure to offer valid summary judgment evidence. Sport Supply argues that the insurance policy that Columbia presented to the district court constituted invalid evidence because Columbia did not provide a complete copy of the policy. Sport Supply's argument lacks merit. Even if the district court erred in admitting the policy into evidence, we will not reverse the district court's evidentiary ruling unless Sport Supply can show it was prejudiced by that decision. *See Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 767 (5th Cir. 2002). Sport Supply does not even attempt to demonstrate prejudice. Nor does it appear that Sport Supply can make a showing of prejudice: it does not dispute that the insurance policy contains the provisions relied upon by Columbia in the district court. Indeed, in arguing that it is entitled to coverage, Sport Supply relies on those same policy provisions.

of the following offenses:

> a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;
> b. Oral or written publication of material that violates a person's right of privacy;
> c. Misappropriation of advertising ideas or style of doing business; or
> d. Infringement of copyright, title or slogan.

Sport Supply contends that trademark infringement constitutes either the "[m]isappropriation of advertising ideas" or the "[i]nfringement of copyright, title or slogan." Therefore, Sport Supply asserts, MacMark's trademark infringement claim is covered by the policy.

Columbia responds that, regardless whether trademark infringement can be deemed an "advertising injury," Sport Supply is not entitled to insurance benefits. Columbia asserts that one of the policy exclusions applies to negate coverage. The policy specifically excludes coverage for "'[a]dvertising injury' *arising out of* . . . [b]reach of contract, other than misappropriation of advertising ideas under an implied contract[.]" Columbia contends that MacMark's alleged "advertising injury" arose out of Sport Supply's breach of its licensing agreement with MacMark. We agree.[4]

---

[4] We reject Sport Supply's assertion that the principle of collateral estoppel applies to prevent Columbia from claiming that Sport Supply is not entitled to coverage in this case. Sport Supply argues that estoppel applies because of a previous action between Sport Supply and Columbia involving identical policy language. In the underlying case, Sport Supply had breached a licensing agreement with Pizza Hut by improperly using the Pizza Hut trademark. In an unpublished opinion, the magistrate judge apparently commented that Pizza Hut's claim of trademark infringement was covered by the "advertising injury" provisions of the policy. The magistrate judge also found that the breach of contract exclusion did not apply. Sport Supply contends that Columbia is bound by these determinations.

We have stated that collateral estoppel is appropriate only when the following four conditions are met. First, the issue in the subsequent action must be identical to the issue litigated in the prior action. Second, the issue must have been fully and vigorously litigated in the prior action. Third, the

Under Texas law, when an exclusion prevents coverage for injuries "arising out of" particular conduct, "[a] claim need only bear an *incidental relationship* to the described conduct for the exclusion to apply." *Scottsdale Ins. Co. v. Tex. Sec. Concepts & Investigation*, 173 F.3d 941, 943 (5th Cir. 1999) (applying Texas law) (emphasis added). MacMark's counterclaim alleged that Sport Supply breached their licensing agreement by advertising and selling products with the Macgregor trademark on the Internet. It seems clear that MacMark's alleged injury bears at least an "incidental relationship" with Sport Supply's breach of contract. *See Pa. Pulp*, 100 S.W.3d at 572-73 (interpreting the same policy language and concluding that the alleged injury—misappropriation of trade secrets—arose out of the breach of a licensing agreement); *Southstar Corp. v. St. Paul Surplus Lines Ins. Co.*, 42 S.W.3d 187, 191 (Tex. App.—Corpus Christi 2001, no pet. h.) (interpreting an insurance policy with a similar exclusion and concluding that the alleged injury—the unauthorized use of a company name—arose out of the breach of a dissolution agreement); *see also Callas Enters., Inc. v. Travelers Indem. Co. of Am.*, 193 F.3d 952, 955-56 (8th Cir. 1999) (interpreting an identical insurance policy and concluding that the alleged injuries—including trademark infringement—arose out of the breach of an exclusive agency contract). Therefore, as Columbia asserts, the exclusion for injuries "arising out of breach of contract" appears to apply in this case.

The exclusion does, however, provide an exception for "misappropriation of advertising ideas

issue must have been necessary to support the judgment in the previous case. Fourth, there must be no special circumstances that would render preclusion inappropriate or unfair. *Gandy Nursery, Inc. v. United States*, 318 F.3d 631, 639 (5th Cir. 2003). Sport Supply cannot satisfy the third element. As Sport Supply concedes, the magistrate judge's ultimate decision did not depend on the above determinations. The magistrate judge held that Sport Supply was not entitled to any insurance proceeds because an exclusion (barring coverage for offenses involving a willful violation of a statute) applied in that case. The magistrate judge's additional comments (regarding coverage for the trademark infringement claim and the applicability of the breach of contract exclusion) were thus not "necessary" to support its judgment. As a result, collateral estoppel does not apply.

under an implied contract[.]" In order to complete the analysis required in duty to defend cases, we examine whether this exception to the breach of contract exclusion could apply in this case. *Cf. Pilgrim Enters., Inc. v. Maryland Cas. Co.*, 24 S.W.3d 488, 498 (Tex. App.—Houston [1st Dist.] 2000, no pet. h.) (observing that courts must find a duty to defend if the insurance policy "potentially" covers the insured). Thus, we consider whether Sport Supply's alleged trademark infringement could constitute the "misappropriation of [an] advertising idea[]."[5]

Courts have differed considerably over whether trademark infringement constitutes the "misappropriation of advertising ideas." *Compare Callas Enters.*, 193 F.3d at 956 (adopting the conclusion of the Sixth Circuit that "misappropriation of advertising ideas or style of doing business" does not include trademark infringement), and *Advance Watch Co. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 802 (6th Cir. 1996) (holding that "'[m]isappropriation of advertising ideas or style of doing business' . . . refer[s] to the unauthorized taking or use of interests other than those which are eligible for protection under statutory or common-law trademark law"), *with CAT Internet Sys., Inc. v. Providence Wash. Ins. Co.*, 153 F. Supp 2d. 755, 761-62 (E.D. Pa. 2001) (concluding that trademark infringement can constitute "misappropriation of advertising ideas or style of doing business"), *Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.*, 61 F. Supp 2d. 611, 617 (S.D. Tex. 1999) (applying Texas law and concluding that "misappropriation of advertising ideas or style of doing business encompasses claims for trademark and trade dress infringement"), and *J.A. Brundage Plumbing &*

---

[5] The meaning of the additional language "under an implied contract" is unclear. We have been unable to locate any Texas state case or any federal case that analyzes the meaning of this phrase in a similar insurance policy. Fortunately, we need not parse the meaning of this phrase. As discussed below, we conclude that Sport Supply's alleged infringement of the Macgregor trademark does not constitute the "misappropriation of [an] advertising idea[]." Based on that determination, we conclude that the *exception* to the breach of contract exclusion does *not* apply. In other words, we hold that the exclusion *does* apply to negate coverage.

*Roto-Rooter, Inc. v. Mass. Bay Ins. Co.*, 818 F. Supp. 553, 557 (W.D.N.Y. 1993), *vacated by settlement* 153 F.R.D. 36, 38 (W.D.N.Y. 1994) ("[I]n the ordinary sense of these terms, misappropriation of an 'advertising idea' would mean the wrongful taking of the manner by which another advertises its goods or services. This would include the misuse of another's trade mark or trade name.").[6]

Any cogent analysis of this issue (whether trademark infringement constitutes the "misappropriation of advertising ideas") should begin with a review of the essential underpinnings of trademark law. A trademark is a word, name, or symbol that is intended to distinguish one producer's goods from those of other producers. *See* 15 U.S.C. § 1127 (defining a "trademark" as "any word, name, symbol, or device, or any combination thereof" that is used by a person "to identify and distinguish his or her goods . . . and to indicate the source of the goods"). Trademark law helps ensure that a trademark can serve this function of distinguishing a producer's goods, because it prohibits other producers from using a similar mark in a way that is "likely to cause confusion" among consumers (*i.e.*, by making consumers wonder which producers created which products). *See* 15 U.S.C. § 1125(a)(1)(A); *Moseley v. V Secret Catalogue, Inc.*, 123 S. Ct. 1115, 1122 (2003) ("[Trademark] law broadly prohibits uses of trademarks, trade names, and trade dress that are likely

___

[6] In these cases, the courts examined insurance policies that were identical to the policy in the present case. *See Callas Enters.*, 193 F.3d at 955 & n.4; *Advance Watch*, 99 F.3d at 798-99; *CAT Internet Sys.*, 153 F. Supp 2d. at 757; *Bay Elec.*, 61 F. Supp 2d. at 615; *J.A. Brundage*, 818 F. Supp. at 555-56. However, the courts were interpreting a different part of the policy. They were studying the coverage provisions of the insurance policy, not the exclusion provisions. Specifically, these courts were concerned with whether trademark infringement constituted "misappropriation of advertising ideas or style of doing business" (and, thus, could be deemed an "advertising injury"). Presumably, the phrase "misappropriation of advertising ideas" has a consistent meaning throughout the insurance policy. Therefore, the interpretation of the phrase provided in these (and similar) cases can help us determine whether Sport Supply's alleged trademark infringement constitutes the "misappropriation of [an] advertising idea[]."

to cause confusion about the source of a product or service."); *see also Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 (5th Cir. 2000) (observing that "[t]o prevail on its trademark infringement claim," the trademark owner must show that the other party's use of the mark "creates a likelihood of confusion in the minds of potential consumers as to the 'source, affiliation, or sponsorship'" of the parties' products).

Trademark law thereby serves two essential functions. First, it aids consumers by assuring them that products with the same trademark come from the same source. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-64 (1995) (observing that trademark law, "by preventing others from copying a source-identifying mark, reduce[s] the customer's costs of shopping and making purchasing decisions, for it quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past") (internal citation and quotation marks omitted) (emphasis in original). Second, trademark law protects the economic investments of the trademark owner. The law assures a producer "that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Id.* at 164.

A trademark can serve these two purposes, however, only to the extent that it distinguishes a producer's goods. *See id.* at 164 (observing that "the source-distinguishing ability of a mark . . . permits it to serve these basic purposes" of trademark law).[7] It thus seems clear that the primary

_____

[7] Perhaps for that reason, a particular "mark" qualifies for trademark protection only to the extent that it distinguishes a product. The law classifies marks into five different categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)); *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 n.2 (5th Cir. 2000). A "generic mark," which refers to an entire class of products (such as "airplane" or "computer"), does not distinguish a product at all, and therefore receives no protection under

function of a trademark is to serve as a label—a mark that identifies and distinguishes a particular product.

Significantly for the purposes of this case, Texas law appears to have adopted this understanding of a trademark. Under Texas law, a trademark is a device intended primarily to identify and distinguish a particular producer's goods. *See* TEX. BUS. & COM. CODE ANN. § 16.01(a)(5) (defining a "trademark" as "a word, name, symbol, device, slogan or any combination thereof . . . used by a person *to identify his goods and distinguish them* from the goods manufactured or sold by others") (emphasis added); *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson*

---

trademark law. *See Two Pesos*, 505 U.S. at 768; William M. Landes & Richard A. Posner, *Trademark Law: An Economic Perspective*, 30 J. LAW & ECON. 265, 291 (1987). A "descriptive mark, " which describes some features or characteristics of a product (*i.e.*, "All Bran" or "Holiday Inn"), s*ee Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999); Landes & Posner, *supra*, at 290, is "not inherently distinctive." *Two Pesos*, 505 U.S. at 769. As a result, a descriptive mark is not protected unless the mark has acquired "secondary meaning" (*i.e.*, the public associates the description ("all bran") almost exclusively with the particular product ("All Bran")). *See Two Pesos*, 505 U.S. at 769.

Suggestive, arbitrary, and fanciful marks, by contrast, better distinguish their products and are therefore accorded more protection under trademark law. *See id.* at 768 ("The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection."). A "suggestive mark" "merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods." *Lane Capital*, 192 F.3d at 344. An example might be "Business Week." Landes & Posner, *supra*, at 289. An "arbitrary mark" uses "a common word in an unfamiliar way." *Lane Capital*, 192 F.3d at 344. A good example might be "Apple Computer." Landes & Posner, *supra*, at 289. Finally, a "fanciful mark" is "not a real word at all," but is invented solely for the purpose of identifying a particular product. *Lane Capital*, 192 F.3d at 344. Examples could include "Kodak" or "Exxon." Landes & Posner, *supra*, at 289.

The underlying action in the instant case involved the alleged infringement of "Macgregor," a trademark associated with various sporting goods. The word "Macgregor"is not a generic term for sporting equipment, nor does it describe (or even suggest) any qualities or characteristics of sporting goods. Therefore, it seems clear that the "Macgregor" trademark is either an "arbitrary" or "fanciful" trademark that, because of its inherent distinctiveness, would be accorded the utmost protection under trademark law. *See Two Pesos*, 505 U.S. at 768.

*Improvement Corp.*, 53 S.W.3d 799, 806 (Tex. App.—Austin 2001, pet. denied) (commenting, in analyzing a claim for infringement of a common law mark, that "[m]arks are . . . eligible for protection only if they can identify and distinguish the plaintiff's goods or services from those of others"); *see also* TEX. BUS. & COM. CODE ANN. § 16.08(a)(6) (noting that a mark can be registered as a trademark "*unless it . . . is likely to cause confusion . . .* because . . . it resembles another persons's unabandoned mark registered in this state") (emphasis added); *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex. App.—Fort Worth 1999, no pet. h.) (noting that "[t]o succeed on a common law claim for trade name infringement," a party must show in part that "there is a likelihood of confusion between its mark and that of its competitor"); *see also id.* ("The issues in a common law trademark infringement action under Texas law are no different than those under federal trademark law.").

This understanding of the function of a "trademark" under both federal law and Texas state law (as a label that identifies and distinguishes a product) enables us to evaluate whether Sport Supply's alleged trademark infringement could qualify as the "misappropriation of [an] advertising idea[]."

In order to understand the meaning of the phrase "misappropriation of advertising ideas," we analyze the individual terms in the phrase. The term "misappropriation" is ordinarily understood as the unlawful taking or use of another person's property. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 1442 (1993) (defining "misappropriate" as "to apply to illegal purposes" and "to appropriate dishonestly for one's own use"); BLACK'S LAW DICTIONARY 998 (6th ed. 1990) (defining "[m]isappropriation" as "[t]he unauthorized, improper, or unlawful use of funds or other property for purpose other than that for which intended"). A trademark is a type of property. *See Coll. Sav.*

-11-

*Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999) ("[T]rademarks

. . . are the 'property' of the owner because he can exclude others from using them."). Thus,

trademark "infringement" would appear to be the "misappropriation" of another person's property

(his trademark).[8] It follows that the infringement of another person's trademark could constitute the

"misappropriation of [an] advertising idea[]" if the idea for the trademark could be deemed an

"advertising idea." In this case, therefore, Sport Supply's alleged infringement could be deemed the

"misappropriation of [an] advertising idea[]" only if MacMark's Macgregor trademark qualifies as

"advertising." Thus, we proceed to examine the meaning of the term "advertising" under Texas law.

The Texas Supreme Court, in another context, adopted the following definition of "advertise":

> To advise, announce, apprise, command, give notice of, inform, make
> known, publish. On [(sic.)] call to the public attention by any means
> whatsoever. Any oral, written, or graphic statement made by the
> seller in any manner in connection with the solicitation of business and
> includes, without limitation because of enumeration, statements and
> representations made in a newspaper or other publication or on radio
> or television or contained in any notice, handbill, sign, catalog, or
> letter, or printed on or contained in any tag or label attached to or
> accompanying any merchandise.

---

[8] We decline to adopt the Sixth Circuit's more limited definition of the term "misappropriation." The Sixth Circuit, in analyzing an identical insurance policy, determined that trademark infringement can never constitute "advertising injury." *See Advance Watch*, 99 F.3d at 802. The court's holding rested in part on its determination that the term "misappropriation" referred primarily to the common law tort of "misappropriation," rather than to a lay person's understanding of the term (*i.e.*, as the wrongful taking of property). *See id.* The Sixth Circuit's narrow and technical interpretation of "misappropriation" does not, in our view, accord with the requirement under Texas law that terms in an insurance policy "are to be given their ordinary and generally accepted meaning, unless the policy shows that the words were meant in a technical or different sense." *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 99 F.3d 695, 700 (5th Cir. 1996) (citing *Sec. Mut. Cas. Co. v. Johnson*, 584 S.W.2d 703, 704 (Tex. 1979)); *see Utica Lloyd's of Tex. v. Sitech Eng'g Corp.*, 38 S.W.3d 260, 263 (Tex. App.—Texarkana 2001, no pet. h.) (same).

*Smith v. Baldwin*, 611 S.W.2d 611, 614-15 (Tex. 1980) (interpreting the term "advertising" under the Texas Deceptive Trade Practices Act); *see First State Bank v. Keilman*, 851 S.W.2d 914, 922 (Tex. App.—Austin 1993, writ denied). The Texas Supreme Court further indicated that "advertising" is a "marketing device[] designed to induce the public to patronize" a particular establishment. *Smith*, 611 S.W.2d at 615; *see id.* (suggesting that "advertising" is "a public notice drawing attention to" the attributes of a business).

The Texas Supreme Court's definition of "advertising" would seem to accord with our common understanding of the term as referring to a device for the solicitation of business. *See Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 748 (3d Cir. 1999); *see also Ekco Group, Inc. v. Travelers Indem. Co. of Ill.*, 273 F.3d 409, 413 (1st Cir. 2001) ("Although the term 'advertising' has a range of meanings, the one that leaps to mind in reading this policy is what is surely the most common use: as a reference to advertising in newspaper, radio, television, or other familiar media where the advertisement is an activity or item distinct from the product being advertised.").

Based on that understanding of "advertising," the Macgregor trademark would not appear to constitute "advertising." The Macgregor mark, like most trademarks, is a *label* that serves primarily to *identify and distinguish* certain MacMark products. The Macgregor label would not, by itself, appear to serve as a "marketing device[] designed to induce the public to patronize" establishments with Macgregor products. Thus, the Macgregor trademark would not, standing alone, appear to be "advertising." *Cf. Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 618-19 (2d Cir. 2001) (observing that "trademarked slogans are phrases used to *promote or advertise* a house mark or product mark" and that "[i]t would be odd indeed to say that the trademarked *name* of a brand, product, or company constitutes a trademarked slogan merely because it remind[s] the

consumer of the brand") (internal quotation marks omitted) (emphasis in original).[9]

Despite this intuitive sense that names and labels of products are not, in and of themselves, advertising, several courts have suggested that a trademark is *inherently* "advertising." *See, e.g.*, *Am. Employers' Ins. Co. v. DeLorme Publ'g Co.*, 39 F. Supp 2d. 64, 74 (D. Me. 1999) ("[A] claim for trademark infringement under the Lanham Act inherently and necessarily implicates possible advertising activities[.]"); *Poof Toy Prods., Inc. v. United States Fid. & Guar. Co.*, 891 F. Supp. 1228, 1235 (E.D. Mich. 1995) ("[A]llegations of trademark and trade dress infringement inherently involve advertising activity."), *rejected by Advance Watch*, 99 F.3d at 805; *J.A. Brundage*, 818 F. Supp. at 558 ("Trademark or tradename infringement . . . necessarily involves advertising, or use, of the mark or name to identify the merchant's goods or services."); *see also Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1193 n.11 (11th Cir. 2002) (observing that "[s]everal courts have found that 'trademark and trade dress infringement inherently involve advertising activity'") (quoting *Poof Toy*, 891 F. Supp. at 1235).

These courts appear to have adopted a very broad (and abstract) definition of "advertising." It is true that, from a theoretical standpoint, any trademark could serve as "advertising." *See* 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 3-2 (4th ed. 1996) (observing that a trademark can serve, in part, "[a]s a prime instrument in advertising and selling . . .

---

[9] One federal district court, in concluding that trademark and trade dress infringement constitute advertising activities, commented that "[t]he Texas Supreme Court has adopted a very broad definition of advertising." *Bay Elec.*, 61 F. Supp 2d. at 618 (citing *Smith*, 611 S.W.2d at 614-15). The Texas courts have adopted a "broad" definition of advertising in the sense that the courts will recognize a number of different forms of solicitation as advertising. *See, e.g.*, *First State Bank*, 851 S.W.2d at 922 (describing the Texas Supreme Court's definition of "advertising" as "very broad" and concluding that "the term clearly includes the posting of notices in public places"). It does not, however, follow that the Texas courts' definition of "advertising" is sufficiently broad to include all types of trademarks.

goods"); *see also* Ralph S. Brown, Jr., *Advertising and the Public Interest: Legal Protection of Trade Symbols*, 57 YALE L. J. 1165, 1166, 1185 (1948) (describing "[t]rade symbols," which include trademarks and trade names, as a "species of advertising"). Once consumers become familiar with a particular product label, they may be induced to buy other products with the same label, not because they have seen the other products "advertised" in any conventional sense, but because the products carry the familiar label. *See* Frank I. Schechter, *The Rational Basis of Trademark Protection*, 40 HARV. L. REV. 813, 819 (1927) ("[T]he trademark is . . . often the most effective agent for the creation of good will, imprinting upon the public mind an anonymous and impersonal guarantee of satisfaction, creating a desire for further satisfactions. The mark actually *sells* the goods.") (emphasis in original). For example, a patron of Macgregor golf clubs might be induced to purchase Macgregor soccer equipment simply because the latter contains the label "Macgregor." In that way, the Macgregor label would serve to "advertise" Macgregor products.[10]

---

[10] Justice Frankfurter eloquently elucidated this abstract understanding of a trademark as a type of marketing tool:

> The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress.

*Mishawaka Rubber & Woolen Mfg. Co.*, 316 U.S. 203, 205 (1942).

Thus, as a theoretical matter, any trademark could constitute "advertising." That does not mean, however, that any trademark constitutes "advertising" *under the terms of this insurance policy*. We must remember that our mission, in interpreting this insurance policy, is not to consider all possible definitions of the policy terms. Instead, in a diversity case such as the present one, we must apply the law of the forum state. Thus, our task is to examine whether, under Texas law, this trademark constitutes "advertising."

Under Texas law, it appears that the term "advertising" in an insurance policy is used in a conventional sense: to refer to a public announcement (such as on a billboard, in a newspaper, on a signpost, or in a television or radio commercial) that "induce[s] the public to patronize" a particular establishment or to buy a particular product. In other words, the term "advertising" refers to a common device for soliciting business.[11] As we have seen, Texas law does not appear to view a trademark as a marketing device. Texas law has adopted the more conventional understanding of a trademark as a *label* that serves primarily to *identify* and *distinguish* products.[12] Thus, under Texas law, the Macgregor trademark would not appear to be "advertising." It follows that the idea for the

---

[11] We note that our interpretation of "advertising" accords with Texas's general rule that terms in an insurance policy "are to be given their ordinary and generally accepted meaning[.]" *Canutillo*, 99 F.3d at 700 (citing *Sec. Mut. Cas. Co.*, 584 S.W.2d at 704; *see Utica Lloyd's*, 38 S.W.3d at 263 (same); *see also supra* note 8.

[12] As a result, under Texas law (as under federal law), a mark is protected to the extent that it serves to *distinguish* a particular product, not to the extent that it *entices* consumers to purchase the product. *See Two Pesos*, 505 U.S. at 768-69; *Horseshoe Bay*, 53 S.W.3d at 806; *see also supra* note 7. If trademark law viewed "advertising" as a trademark's main function, a descriptive mark might receive more protection under trademark law than an arbitrary mark. After all, a descriptive mark, such as "All Bran," which describes the characteristics of a product, might be more likely to catch the public's immediate attention and induce consumers to buy the product than an arbitrary mark like "Macgregor." (That would seem to be the case at least until the public became familiar with the "All Bran" and "Macgregor" product lines.) Yet a descriptive mark receives less protection under trademark law, because it does not serve to distinguish a product as well as an arbitrary mark.

Macgregor trademark is not an "advertising idea," and that the infringement of the Macgregor trademark could not be seen as the "misappropriation of [an] advertising idea[]."

Thus, even under the "broadest reading" of the phrase "misappropriation of advertising ideas" as "the . . . wrongful[] tak[ing of] an idea about the solicitation of business," *Frog, Switch*, 193 F.3d at 748 (internal quotation marks omitted), Sport Supply's alleged infringement of the Macgregor trademark does not constitute the "misappropriation of [an] advertising idea[]." As a result, the *exception* to the coverage exclusion for injuries "arising out of" breach of contract does *not* apply. In other words, the breach of contract exclusion *does* apply in this case. Therefore, Sport Supply is not entitled to reimbursement for any of its defense costs. The district court properly granted Columbia's motion for summary judgment.[13]

### III

Sport Supply also asserts several claims against RKSCo, the loss adjusting company that Sport Supply retained to assist it in filing insurance claims. Sport Supply's allegations against RSKCo relate to the "notice" provisions of the insurance policy issued by Columbia. Columbia originally denied Sport Supply's coverage claim based on its conclusion that Sport Supply had failed to notify the insurance company of MacMark's counterclaim in a timely manner. Sport Supply alleges that, under a contract that it had with RSKCo, it was in fact RSKCo's responsibility to promptly notify Columbia about the dispute with MacMark. Sport Supply appears to assert that RSKCo's failure to perform this duty caused Columbia to deny coverage to Sport Supply.

First, Sport Supply contends that RSKCo breached a contract with Sport Supply by failing

---

[13] Because we conclude that the breach of contract exclusion applies in this case, we do not address Columbia's additional arguments as to why Sport Supply is not entitled to coverage.

to notify Columbia about MacMark's counterclaim. Under Texas law, the elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Renteria v. Trevino*, 79 S.W.3d 240, 242 (Tex. App.—Houston [14th Dist.] 2002, no pet. h.); *see La Villa Indep. Sch. Dist. v. Gomez Garza Design, Inc.*, 79 S.W.3d 217, 225 (Tex. App.—Corpus Christi 2002, pet. denied). The plaintiff bears the burden of demonstrating that he suffered a loss as a result of the breach. *See Taub v. Houston Pipeline Co.*, 75 S.W.3d 606, 617 (Tex. App.—Texarkana 2002, pet. denied). In this case, Sport Supply alleges that its coverage claim was denied by Columbia because RSKCo failed to report MacMark's counterclaim to Columbia in a timely manner. However, as we have held, Sport Supply was never entitled to recover any insurance proceeds because the breach of contract exclusion applies to negate coverage. Thus, even assuming that RSKCo had a contractual duty to timely report all claims to Columbia, and assuming that RSKCo failed to perform that duty in this case, Sport Supply was not damaged by RSKCo's alleged breach. Thus, Sport Supply cannot demonstrate all of the elements of a breach of contract claim. The district court properly granted RSKCo's motion for summary judgment as to this claim.

Second, Sport Supply alleges that RSKCo was negligent for failing to report the MacMark counterclaim to Columbia in a timely manner. Under Texas law, the elements of a negligence claim are (1) a legal duty on the part of the defendant; (2) breach of that duty; and (3) damages proximately resulting from that breach. *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998); *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998). Again, the only "damages" alleged by Sport Supply are the damages it suffered when Columbia refused to reimburse Sport Supply for its defense costs. As we have just discussed, Sport Supply was never entitled to any insurance proceeds because the breach

of contract exclusion applies to preclude coverage. Thus, RSKCo's alleged breach of a duty to report the MacMark counterclaim was not the proximate cause of any damages suffered by Sport Supply. Therefore, Sport Supply cannot demonstrate an essential element of its tort claim. The district court properly granted RSKCo's motion for summary judgment as to this claim.[14]

For the above reasons, the judgement of the district court is AFFIRMED.

---

[14] We decline to consider Sport Supply's assertion that RSKCo violated Article 21.21 of the Texas Insurance Code. *See* TEX. INS. CODE ANN. art. 21.21 § 4 (listing various "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance"). Sport Supply alleges (1) that RSKCo misrepresented the extent to which it was responsible for reporting potential claims to Columbia; and (2) that RSKCo failed to promptly disclose its determination that MacMark's counterclaim was not covered by the policy. Sport Supply fails to support these allegations with any legal argument. Therefore, we need not consider these contentions. *See* FED. R. APP. P. 28(a)(9)(A); *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 376 n.3 (5th Cir. 2003) (observing that issues inadequately briefed are deemed waived).