Opinion issued February 15, 2007

 










In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00420-CV






MEMC ELECTRONIC MATERIALS, INC., and MEMC PASADENA, INC.,
Appellants


V.


ALBEMARLE CORPORATION, LEXINGTON INSURANCE CO., and
TRAVELERS PROPERTY CASUALTY GROUP, Appellees






On Appeal from the 55th District Court

Harris County, Texas

Trial Court Cause No. 2002-59930





 

O P I N I O N


 Appellants, MEMC Electronic Materials and MEMC Pasadena (collectively
MEMC), appeal the trial court's order that granted a motion for partial summary
judgment urged by appellees, Albemarle Corporation and its insurers, Lexington
Insurance and Travelers Property Casualty Group, and that denied MEMC's cross-motion for partial summary judgment. (1) After Albemarle indemnified Ethyl
Corporation for claims paid by Ethyl to three people who were injured in a fire at a
manufacturing plant, Albemarle sought indemnification from MEMC for Albemarle's
payment to Ethyl. MEMC refused to indemnify Albemarle, contending that the Asset
Purchase Agreement between MEMC and Albemarle does not require the
indemnification. In a single issue on appeal that challenges the trial court's rendition
of summary judgment in favor of Albemarle, MEMC asserts three reasons that the
trial court should have rendered judgment in its favor. First, MEMC contends that
Albemarle's right to obtain indemnification from MEMC under the Asset Purchase
Agreement was not triggered by the claims against Ethyl because every claim for
which Ethyl was held liable arose out of Ethyl's design and operation of the plant
prior to the closing date of the Asset Purchase Agreement. Second, MEMC asserts
that the Ethyl Indemnity Agreement was not an obligation that it assumed under the
terms of the Asset Purchase Agreement. Third, MEMC states that Albemarle's claim
for indemnity is unenforceable under Texas and Virginia law. Albemarle replies by
asserting that its indemnification of Ethyl was required under Virginia law, that the
indemnification provision of the Asset Purchase Agreement is not modified by any
other part of the agreement, and that the indemnification's before-and-after nature
provides for the indemnification that it seeks here. (2) 

 Considering the entire agreement and all individual provisions in the context
of the whole instrument, we conclude that the Asset Purchase Agreement does not
obligate MEMC to indemnify Albemarle for its payment to Ethyl for Ethyl's liability
for injuries caused by a fire at the plant. We do not reach the issue of whether the
laws of Texas and Virginia make the indemnity agreement unenforceable as matter
of law. We reverse and render judgment in favor of MEMC.Background

 Ethyl designed and built a polysilicon manufacturing plant located in Pasadena,
Texas. In 1994, Ethyl created Albemarle as a separate company and transferred
various of its businesses, including the plant, to Albemarle's ownership and control. 
The transfer was under a "Reorganization and Distribution Agreement." Ethyl and
Albemarle also entered into an "Indemnification Agreement," under which Albemarle
agreed to "indemnify, defend and hold harmless Ethyl . . . from and against any and
all Indemnifiable Losses of the Ethyl Indemnitees arising out of or due to the failure
or alleged failure of Albemarle or any of its Affiliates to pay, perform, or otherwise
discharge in due course any of the Albemarle Liabilities." The agreements between
Ethyl and Albemarle are governed by the laws of the state of Virginia.

 In 1995, Albemarle sold the plant to MEMC pursuant to an "Asset Purchase
Agreement" that is governed by Texas law. The closing date for the agreement was
July 31, 1995. Under a separate agreement, MEMC and Albemarle agreed that
Albemarle would continue to operate the plant.

 The Asset Purchase Agreement describes the transfer of the plant and other
assets and liabilities in Sections 3.3 and 3.4. Some assets and liabilities were
specifically excluded from the transfer, and only certain liabilities were assumed by
MEMC. Section 3.4 (b) specifies that MEMC "shall not assume any other Liabilities
of Seller whatsoever" except "those Liabilities specifically assumed" in Section
3.4(a). Section 3.4(a) does not mention the agreement between Ethyl and Albemarle,
nor was that agreement a contract that was assumed by MEMC in the accompanying
Schedule 3.4(a)(i). The agreement further specified that MEMC did not assume any
liability that results or arises from the operation of the plant prior to the closing date.

 Albemarle made certain representations and warranties to MEMC. Under
Section 4.16, labeled "Contracts and Commitments," Albemarle represented that,
except as set forth in Schedule 4.16, it was "not a party to" and the transferred assets
"are not bound by" and the Assumed Obligations "shall not include, any written or
oral, formal or informal . . . agreements between or among Seller and any Affiliate of
Seller . . . ." Schedule 4.16 did not mention the indemnity agreement between Ethyl
and Albemarle. 

 The Asset Purchase Agreement between Albemarle and MEMC included an 
indemnity provision. Generally speaking, depending on whether the damages arose
out of the operation of the plant "prior to the closing date" or "on or after the closing
date," MEMC would indemnify Albemarle for the damages, or Albemarle would
indemnify MEMC for the damages. In Section 7.3, Albemarle agreed to indemnify
MEMC from and against all damages incurred by MEMC directly or indirectly by
reason of or resulting from liabilities, obligations or claims, with respect to the plant
arising out of operations of the plant prior to the Closing Date. Similarly, Section 7.4
provided that MEMC would indemnify Albemarle from and against all damages
asserted against, resulting to, imposed upon or incurred by Albemarle, directly or
indirectly by reason of or resulting from liabilities, obligations or claims with respect
to the plant arising out of the operations of the plant on or after the Closing Date.

 In 1996, three Albemarle employees were injured when a fire broke out at the
plant. The employees, collectively referred to as the the Damewood plaintiffs, filed
a lawsuit against a number of parties, including Ethyl and MEMC. (3) Albemarle,
which carried worker's compensation coverage, was not subject to suit. MEMC
settled with the Damewood plaintiffs. Of the parties relevant to the present case, only
Ethyl went to trial in the underlying litigation. Pursuant to the agreement between
Ethyl and Albemarle, Albemarle defended Ethyl in the Damewood litigation. At the
close of the trial, Ethyl was the only remaining defendant, and a jury rendered a
verdict in excess of six-and-a-half million dollars against Ethyl. Ethyl appealed, and
while the appeal was pending, it settled with the Damewood plaintiffs for
approximately five million dollars. Ethyl sought indemnification from Albemarle
under the terms of their agreement. Albemarle indemnified Ethyl for its losses, which
is the amount that Albemarle now seeks from MEMC in this lawsuit. 

 MEMC filed for summary judgment, which was denied. Albemarle then filed
a motion for partial summary judgment on the issue of whether MEMC was obligated
to indemnify Albemarle, and MEMC re-urged its motion as a cross-motion for partial
summary judgment. The trial court ruled in Albemarle's favor. The trial court
severed the summary judgment order and abated the question of damages so the
parties could bring the present appeal.

Standard of Review

 When reviewing cross-motions for summary judgment, we consider both
motions and render the judgment that the trial court should have entered. Coastal
Liquids Transp., L.P. v. Harris County Appraisal Dist., 46 S.W.3d 880, 884 (Tex.
2001). Further, in a contract action where, as here, neither party contends that a
contract is ambiguous, a court should construe the contract as a matter of law, and,
on appeal, the court's ruling is subject to de novo review. See J.M. Davidson, Inc. v.
Webster, 128 S.W.3d 223, 229 (Tex. 2003) (citing Coker v. Coker, 650 S.W.2d 391,
394 (Tex. 1983)) (applying rule to arbitration agreement); C.M. Asfahl Agency v.
Tensor, Inc., 135 S.W.3d 768, 780 (Tex. App.--Houston [1st Dist.] 2004, no pet.)
(interpreting asset purchase agreement); Tesoro Petroleum Corp. v. Nabors Drilling
USA, Inc., 106 S.W.3d 118, 125 (Tex. App.--Houston [1st Dist.] 2002, pet. denied)
(interpreting indemnity agreement); Webb v. Lawson-Avila Constr., Inc., 911 S.W.2d
457, 459-60 (Tex. App.--San Antonio 1995, writ dism'd w.o.j.).

 "An indemnity agreement is a promise to safeguard or hold the indemnitee
harmless against either existing and/or future loss liability." Dresser Indus., Inc. v.
Page Petroleum, Inc., 853 S.W.2d 505, 508 (Tex. 1993). Indemnity provisions are
to be strictly construed, pursuant to the usual principles of contract interpretation, in
order to give effect to the parties' intent as expressed in the agreement. See Ideal
Lease Serv., Inc. v. Amoco Prod. Co., 662 S.W.2d 951, 953 (Tex. 1984). In
construing a written contract, the court's primary concern is to ascertain the true
intent of the parties as expressed in the instrument. J.M. Davidson, Inc., 128 S.W.3d
at 229; see C.M. Asfahl Agency, 135 S.W.3d at 780. Accordingly, the court must
examine and consider the entire writing in an effort to harmonize and give effect to
all provisions so that none is rendered meaningless. J.M. Davidson, Inc., 128 S.W.3d
at 229. The court may not consider any single provision, taken in isolation, as
controlling, but must consider all provisions in the context of the entire instrument. 
Id. Obligations Assumed by MEMC Under the Agreement

 MEMC contends that, in its Asset Purchase Agreement with Albemarle, it did
not assume an obligation for the indemnity agreement between Ethyl and Albermarle. 
MEMC contends that Sections 3.4, 4.16 and 3.3(b) exclude the agreement between
Albemarle and Ethyl from the agreement between Albemarle and MEMC. Albemarle
does not dispute that the agreement between Ethyl and Albemarle is never mentioned
specifically in the agreement between Albemarle and MEMC. Albemarle, however,
asserts that it is entitled to indemnification from MEMC under Section 7.4, the
section of the agreement that pertains to indemnification. 

 A. MEMC Does Not Assume Obligation for Ethyl-Albemarle Agreement MEMC points to Section 3.4 of the Asset Purchase Agreement to show that it
did not assume any obligation for the indemnity agreement between Ethyl and
Albermarle. As noted above, Albemarle does not dispute that Section 3.4 does not
mention the agreement between Ethyl and Albemarle.

 1. Section 3.4(a)

 The Asset Purchase Agreement describes the transferred business and
transferred assets. Section 3.4(a) specifically describes "Assumed Obligations."
These are obligations, assumed by MEMC, of liabilities that belong to Albemarle. 
The only obligations that are assumed by MEMC are those that are listed in Schedule
3.4(a)(i), the "Assumed Contracts[.]" (4) The agreement between Ethyl and Albemarle
was not listed in Schedule 3.4(a)(i) as a contract that was assumed by MEMC. 
Moreover, the agreement between Albemarle and MEMC specifically provided that
MEMC would "assume no liabilities relating to the Assumed Contracts which result
or arise from operation of the Transferred Business or the Transferred Assets prior
to the Closing Date." MEMC thus correctly points out that Section 3.4(a) provides
that MEMC is assuming an obligation for only the liabilities of Albemarle that "are
listed in Schedule 3.4(a)(i)[,]" and that the agreement between Ethyl and Albermarle
is not listed in that Schedule. We agree with MEMC's representation that under
Section 3.4(a), it has not assumed liability for the agreement between Ethyl and
Albemarle.

 2. Section 3.4(b) 

 The Asset Purchase Agreement specifies under Section 3.4(b) that liabilities
of Albermarle are not being assumed by MEMC. The only exception is that MEMC
is assuming liability for items listed in Schedule 3.4(a)(i), which is the schedule
included within 3.4(a). Section 3.4(b) states that MEMC "shall not assume any other
Liabilities" of Albemarle, unless the liability is "specifically assumed in writing"
under Section 3.4(a). The agreement between Albemarle and Ethyl is not listed in
Schedule 3.4(a)(i) and is therefore excluded from the obligations assumed by MEMC. 
MEMC thus accurately represents that under Section 3.4(b), it has not assumed
liability for the agreement between Ethyl and Albemarle. (5) 

 In summary, Sections 3.4(a) and (b) provide that MEMC is not assuming
obligation for liabilities of Albemarle that are not specifically set forth in Schedule
3.4(a). The agreement between Ethyl and Albemarle is not mentioned in Schedule
3.4(a). We conclude that Section 3.4 of the agreement does not provide for MEMC
to assume obligation for the indemnity agreement between Ethyl and Albermarle. 
Our task, however, is not merely to examine a single provision of the agreement, but
to look at all the provisions in the context of the entire instrument in an effort to
harmonize and give effect to all provisions so that none is rendered meaningless. See
J.M. Davidson, Inc., 128 S.W.3d at 229. 

 B. Albemarle Did Not Disclose Ethyl-Albermarle Agreement

 MEMC contends that the failure of Albemarle to disclose the existence of the
indemnity agreement between Ethyl and Albemarle shows that there was never any
obligation by MEMC for that agreement. Albemarle makes representations and
warranties to MEMC in the Asset Purchase Agreement. Under Section 4.16(a)(x) of
the Asset Purchase Agreement, Albemarle represents that it is not "a party to" and is
"not bound by" any "agreements between or among" Albemarle and any "Affiliate." 
The indemnification agreement between Ethyl and Albemarle showed that Albemarle
was Ethyl's "wholly-owned subsidiary[,]" which meets the definition of affiliate in
the agreement between Albemarle and MEMC. (6) Further, Section 4.16(xiii) includes
Albemarle's representation that it is not "a party to" and is "not bound by . . . any
other agreement, contract, commitment, arrangement or instrument that relate[s] to
or may affect the plant." (7) The only exception to these provisions concerns
agreements listed in schedules accompanying the Asset Purchase Agreement. As
noted above, the indemnity agreement between Ethyl and Albemarle was never
disclosed in any schedule, nor was it ever mentioned in the Asset Purchase
Agreement. We conclude that Section 4.16 called for Albemarle to disclose contract
and commitments that "relate to or may affect" the plant, but Albemarle did not
disclose its indemnity agreement with Ethyl. We also conclude that Albemarle failed
to disclose in Section 4.16 the indemnity agreement it had with its affiliate, Ethyl. 
Albemarle's failure to disclose its indemnity agreement with Ethyl suggests that
MEMC was not aware of that agreement and did not obligate itself to cover any
liability imposed under that agreement. We conclude that terms of Section 4.16
support MEMC's position that it is not obligated for the indemnity agreement
between Albemarle and Ethyl.

 In view of Sections 3.4 and 4.16 of the Asset Purchase Agreement, we
conclude that those sections suggest that MEMC was not obligated to indemnify
Albemarle for the payment that it made to Ethyl. (8)

The Indemnification Portion of the Agreement

 Albemarle contends that the indemnification terms specified by Section 7.4 of
the agreement require MEMC to indemnify Albemarle, and that under the rules of
contract construction, we must favor an interpretation that affords some consequence
to each part of the instrument so that none of its provisions will be rendered
meaningless. Albemarle contends Section 7.4(a) requires MEMC to indemnify it for
its obligation to Ethyl so long as that obligation (9) (1) is with respect to the transferred
business, (10) and (2) arose out of the operation of the transferred business, (3) on or
after the closing date. 

 MEMC's challenge on appeal focuses on the term "arising out of the operations
of the Transferred Business . . . on or after the Closing Date." MEMC contends that
the undisputed evidence shows that Albemarle's payment to Ethyl was due to the
agreement between them, which occurred prior to the Closing Date of the Asset
Purchase Agreement between Albemarle and Ethyl, and that the payment did not arise
out of the operations of the plant on or after the Closing Date. In short, the tort claims
by the Damewood plaintiffs are not the legal basis for Albemarle's indemnity claim
here. MEMC also asserts that the undisputed summary judgment record indicates that
every claim for which Ethyl was held liable arose out of Ethyl's design and operation
of the plant prior to the closing date of the Asset Purchase Agreement.

 Albemarle responds that we should rely on the specific indemnity provision in
Section 7.4(a) of the Asset Purchase Agreement, despite the fact that the Asset
Purchase Agreement fails to mention the indemnity agreement between Ethyl and
Albemarle. Albemarle contends that "Resolution of the meaning of the term 'arising
out of' is, perhaps, the central and controlling issue presented to this Court." 
Albemarle asserts that it is asking this Court to give "arising out of" the "normal
inclusive" reading that "reasonable mutual indemnitors would have accorded the
phrase." 

 Under Section 7.4(a) of the Asset Purchase Agreement, MEMC must indemnify
Albemarle for all damages asserted against, resulting to, imposed upon or incurred
by Albemarle directly or indirectly by reason of or resulting from liabilities,
obligations or claims with respect to the plant arising out of the operations of the
plant on or after the Closing Date. (11) The Damewood plaintiffs were injured after the
Closing Date of the Asset Purchase Agreement and there is no dispute that those
injuries arose out of the operations of the plant. The damages at issue here, however,
consist of the payment made by Albemarle to Ethyl pursuant to their indemnity
agreement, which was an agreement in existence before the Closing Date of the Asset
Purchase Agreement. We conclude that the payment made to indemnify Ethyl was
not a liability, obligation or claim arising out of the operations of the plant, but rather
a payment that arose out of the prior contractual relationship between Albemarle and
Ethyl. 

 We disagree with the assertion by Albemarle that we will render Section 7.4(a)
meaningless if we interpret the Asset Purchase Agreement to deny recovery here. The
Asset Purchase Agreement plainly provides for MEMC to indemnify for damages
arising out of the operations of the plant on or after the Closing Date. That indemnity
agreement remains in place for any liabilities, obligations or claims that arise out of
the operations of the plant on or after the closing date. Our holding merely denies
recovery for any Albemarle liabilities, obligations or claims that arise out of
unidentified, contractual obligations in existence prior to the Closing Date that were
not specifically mentioned by the Asset Purchase Agreement with MEMC. (12) 

 Viewing the indemnity provision in context with the agreement as a whole, our
conclusion is consistent with the other sections of the agreement. As we noted above,
Section 3.4 of the agreement does not provide for MEMC to assume an obligation for
the indemnity agreement between Albemarle and Ethyl. Additionally, Albemarle's
failure to disclose the agreement under Section 4.16, suggests that MEMC was not
aware of the agreement. We further noted that Section 4.16(a)(x) suggests that
MEMC is not obligated to Albemarle for its payment to Ethyl because it is a "wholly-owned subsidiary" of Ethyl, which would qualify as an "Affiliate of Seller" under the
Asset Purchase Agreement.

 Albemarle refers us to decisions that interpret "arising out of" language to
require only a causal nexus between the action and the result. For its broad
interpretation, Albemarle calls this court's attention to a number of cases construing
insurance contracts. See Mid-Century Ins. Co. of Tex. v. Lindsey, 997 S.W.2d 153,
156 (Tex. 1999); Utica Nat'l Ins. Co. v. Am. Indem. Co., 141 S.W.3d 198, 203 (Tex.
2004); McCarthy Bros. Co. v. Cont'l Lloyds Ins. Co., 7 S.W.3d 725, 730 (Tex.
App.--Austin 1999, no pet.); Gen. Agents Ins. Co. v. Arredondo, 52. S.W.3d 762, 767
(Tex. App.--San Antonio 2001, pet. denied); Sport Supply Group, Inc. v. Columbia
Cas. Co., 335 F.3d 453, 458 (5th Cir. 2003). In interpreting an insurance policy,
when that policy "is subject to more than one reasonable interpretation, we must
adopt the construction most favorable to the insured when we resolve the
uncertainty." State Farm Fire & Cas. Co. v. Vaughan, 968 S.W.2d 931, 933 (Tex.
1998). Albemarle presents no authority that requires us to interpret the terms of
contractual indemnity in a commercial setting--terms which neither party contends
are subject to multiple reasonable interpretations--to favor the indemnitee. 

 MEMC relies on an unpublished decision from this Court in Union Tex.
Petroleum Energy Corp. v. Kelly Operating Co., No. 01-96-00346-CV, 1997 WL
476322 (Tex. App.--Houston [1st Dist.] Aug. 21, 1997, no pet.) (not designated for
publication). In August 1990, four men were injured by a well and sued Union Texas
for negligent dredging of an oil well extension canal that occurred in 1975. Id. at *1. 
Kelly refused to indemnify Union Texas under their May 1990 agreement that
provided that Kelly would discharge all obligations arising out of the purchased
property with respect to all occurrences on or after the Effective Date of the
agreement. Id. This Court held that the agreement that provided for indemnity after
May 1990 did not apply because the negligent conduct--the 1975 dredging of the oil
well--occurred prior to the effective date of the agreement. Id. at *3. Here,
similarly, the liability, obligation or claim arises from the contractual relationship
between Albemarle and Ethyl, which occurred before the Closing Date of the Asset
Purchase Agreement. See id.

 Examining the entire writing in order to give effect to the intent of the parties
as expressed in the agreement, and in order to render no clause meaningless, we
conclude that the Asset Purchase Agreement does not obligate MEMC to indemnify
Albemarle for the payment to Ethyl under the agreement between Albemarle and
Ethyl. The trial court therefore erred by granting partial summary judgment for
Albmarle, and also erred by failing to grant partial summary judgment in favor of
MEMC.

 Conclusion


 We reverse and render judgment for MEMC.



 Elsa Alcala

 Justice


Panel consists of Justices Taft, Alcala, and Hanks.
1. The trial court granted the parties' Joint Motion to Sever and Abate the damages
portion of the case, rendering the grant of partial summary judgment a final,
appealable judgment.
2. Both parties filed post-submission supplemental briefs with this Court. We allow this
supplementation in accordance with Rule 38.7 of the Texas Rules of Appellate
Procedure. See Tex. R. App. P. 38.7 ("A brief may be amended or supplemented
whenever justice requires, on whatever reasonable terms the court may prescribe.")
3. Larry Damewood, Gary Woodard, and Roy Moss v. Ethyl Corporation, Cause No. 96-38521, in the 189th District Court of Harris County, Texas. 
4. The Asset Purchase Agreement states, 


Section 3.4 Assumptions by MEMC Pasadena

 

 (a) Liabilities Being Assumed. Except as otherwise
expressly provided herein and subject to the terms and
conditions of the Agreement, simultaneously with the
sale, transfer, conveyance and assignment to MEMC
Pasadena of the Transferred Assets, MEMC Pasadena
shall assume and agree and undertake in writing to pay,
perform, and discharge as and when due . . . the
following Liabilities of Seller (collectively, "Assumed
Obligations"):


 (i) those Liabilities of Seller under all contracts,
leases, subleases, commitments, supply contracts,
agreements and orders relating primarily to the
operation of the Transferred Business or the
Transferred Assets, but in all such cases only to
the extent the same are listed in Schedule 3.4(a)(i)
attached hereto (the "Assumed Contracts")
provided, however, that MEMC Pasadena shall
assume no liabilities relating to the Assumed
Contracts which result or arise from operation of
the Transferred Business or the Transferred
Assets prior to the Closing Date . . . .
5. Section 3.4(b) of the Asset Purchase Agreement states,


(b) Liabilities Not Being Assumed. Except for those Liabilities
specifically assumed in writing by MEMC Pasadena pursuant to
Section 3.4(a) hereof, MEMC Pasadena shall not assume any
other Liabilities of Seller whatsoever such as (by way of
example and without limitation of the scope of the preceding
portion of this sentence), the following (collectively, "Excluded
Obligations").

 

 (i) any Liabilities of Seller (other than Assumed
Obligations) of any nature whatsoever (regardless of
whether the existence of such Liability (A) is or was at
any time known or unknown to MEMC Pasadena,
MEMC or Seller or (B) constitutes or does not constitute
a breach of any representation or warranty of Seller to
MEMC or MEMC Pasadena) to the extent arising or
incurred or which arose or were incurred on or before the
Closing, or which are based on (1) events occurring on or
before the Closing, or (2) the operation of the
Transferred Business on or before the Closing,
notwithstanding that the date on which the claim,
demand or Liability arose is after the Closing . . . 
6. "Affiliate" is defined in the agreement as "in the case of an entity, any person who or
which, directly or indirectly, through one or more intermediaries, controls or is
controlled by, or is under common control with, any specified Person (the term
"control" for these purposes means the ability, whether by ownership of shares or
other equity interest, by contract or otherwise, to elect a majority of the directors of
a corporation . . . or have the power to remove and then select, a majority of those
Persons exercising governing authority over an entity)."
7. The Asset Purchase Agreement states, 


Section 4.16 Contracts and Commitments 


 (a) Except as set forth in Schedule 4.16 or in other
Schedules to this Agreement hereof, to Seller's
knowledge, Seller is not, with respect to the Transferred
Business or the Transferred Assets, a party to, and the
Transferred Assets and the Transferred Business are not
bound by, and the Assumed Obligations shall not
include, any written or oral, formal or informal . . .


[the section lists a number of possible contractual obligations]


 (x) agreements between or among Seller and any
Affiliate of Seller;

 

 . . . 

 

 (xiii)any other agreement, contract, commitment,
arrangement or instrument that relate to or may
affect the Transferred Business, except for the
Assumed Contracts.
8. We disagree with MEMC that Section 3.3(b) supports its position that it is not
obligated to Albemarle here, because we conclude that the section is inapplicable. 
Section 3.3(b) states that Albemarle continues to have responsibility for certain assets,
including "(v) all indemnification rights against and indemnification agreements with
other parties arising out of the Transferred Business or the Transferred Assets prior
to the Closing Date." The indemnity agreement between Ethyl and Albemarle is not
an asset of Albemarle's, but is rather a liability, and that Section, therefore, does not
aid in our analysis of the issues here. 
9. MEMC does not challenge Albemarle's assertion that it met the term "Liabilities,
Obligations or Claims" because the lawsuit arising out of the January 1996 fire would
qualify as an obligation, claim, or liability. The Asset Purchase Agreement defines
Liabilities as: "any and all debts, claims, liabilities and obligations of any kind,
regardless of whether disclosure thereof would be required to be made in accordance
with [Generally Accepted Accounting Principles], whether accrued or fixed, absolute
or contingent or determined or determinable."
10. Albemarle contends that it is undisputed that the Damewood plaintiffs were injured
while performing polysilicon manufacturing operations for the Pasadena business, and
thus the injuries were "with respect to the Transferred Business." The agreement
between Albemarle and MEMC defines "Transferred Business" as "all of the business
of Seller related to the manufacture of granular polysilicon, silane, sodium aluminum
fluoride, and sodium ethyl silicate at the manufacturing facilities of Seller located in
Pasadena, Texas, but specifically excluding Seller's sodium aluminum hydride
business[.]" 
11. Section 7.4 of the Asset Purchase Agreement provides that MEMC will indemnify
Albemarle under certain circumstances. The agreement states,


Section 7.4 MEMC's and MEMC Pasadena's Agreement to
Indemnify. Subject to the terms and conditions of this Article
7, MEMC and MEMC Pasadena jointly and severally agree to
indemnify, defend and hold harmless Seller from and against all
Damages asserted against, resulting to, imposed upon or
incurred by Seller, directly or indirectly (collectively, "Seller
Claims"), by reason of or resulting from:


 (a) without prejudice to any obligations of Seller under
the Operating Agreement or the Utilities and Services
Agreement, liabilities, obligations or claims with respect
to the Transferred Business or the Transferred Assets
(whether absolute, accrued, contingent or otherwise)
arising out of the operations of the Transferred Business
or the Transferred Assets (including the Facility and the
Facility Site) on or after the Closing Date;

 

 (b) liabilities with respect to the Assumed Obligations
and the Assumed Contracts;

 

 (c) a breach of any representation, warranty or agreement
of MEMC or MEMC Pasadena contained in or made
pursuant to this Agreement . . . .
12. In its most recent supplemental brief, Albemarle contends that the language in Section
7.4. which states that the section is "[s]ubject to the terms and conditions of this
Article 7" requires us to read Section 7.4 independently of Articles 3 and 4. To the
contrary, we note that the term "subject to the terms and conditions" appears
throughout the agreement, and nowhere requires any section to be read in isolation. 
We also note that Section 7.1 expressly incorporates all other agreements between the
parties into Article 7:

 

 All representations, warranties and agreements made by
any party to this Agreement or pursuant hereto shall be
true, complete, and correct as of the date hereof and at
and as of the Closing Date as though such
representations, warranties, covenants and agreements
were made at and as of the closing date.